No. 90-255

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JOHN ED GAMBREL, JR.,

Defendant and Appellant.

FILED

DEC 18 1990

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Leif B. Erickson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Don Vernay, Esq., Kalispell, Montana

For Respondent:

Hon. Marc Racicot, Attorney General; Paul D.
Johnson, Assistant Attorney General; Helena, Montana

Ted O. Lympus, County Attorney, Kalispell, Montana

Submitted on Briefs: November 15, 1990

Decided: December 18, 1990

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

John Ed Gambrel, Jr., was convicted of deliberate homicide following a jury trial in the District Court for the Eleventh Judicial District, Flathead County. He appeals. We affirm.

The issues are:

1. Did the District Court err in denying the defendant's motion in limine and admitting into evidence the testimony of Alane Shuster, Shelly Birky, and Kathryn Jinx Kinslow?

2. Did the court err in denying the defendant's motions for a mistrial?

3. Did the court err in denying the defendant's motion for a new trial?

Defendant John Ed Gambrel, Jr., stands convicted of the February 5, 1989, murder of Lori Anne Schwegel in Whitefish, Montana. Following a report of a shooting shortly after 2 a.m. on that date, police officers discovered Schwegel's body in the apartment she had shared with Gambrel. She had been shot three times in the chest, once in the right hand, once in the left cheek, and once in the right leg. Her body was lying on the living room floor next to a rifle and rifle case later determined to be Gambrel's. Twelve spent shell casings were recovered from the living room, and two bullets were embedded in the ceiling. The front door of the apartment was ajar. There was no sign of forced entry or struggle.

2

Gambrel, suffering obvious head wounds, arrived at the apartment minutes later. He was transported to a hospital by ambulance, during which time he spoke a lot of gibberish and said, "help us, help us," "help Lori," "them coke son-of-a-bitches," and also "I didn't mean to hurt her."

Gambrel claims that he and Schwegel were attacked by an unidentified third party. At trial, he testified that after a night on the town, he was knocked unconscious as he entered the apartment he and Schwegel shared. Gambrel testified that when he regained consciousness, he was lying across the body of Schwegel, who had stayed home that evening. He testified that he realized he had been shot and went to the apartment of his upstairs neighbor, who summoned the police.

Gambrel's upstairs neighbor, Stuart McQuade, testified that he arrived home at about 2:00 a.m. He stated that he heard three "bangs" just before Gambrel came to his door for assistance. He stated that he did not see anyone around the apartments and, other than the three "bangs," did not hear anything, although according to him the apartment walls were thin.

Gambrel hypothesized that he and Schwegel had been shot on the orders of Ben Sagen, at whose home he had at one time stayed. He claimed that Sagen had a contract out on his life. Sagen denied that. Sagen testified that Gambrel did owe him money and that he had threatened to contract with a collection agency to recover it.

3

Gambrel talked to a group of police officers on his way home about 2:00 a.m. One of those officers characterized Gambrel's behavior at that time as "acting quite different." The State's theory is that Gambrel spent several hours downtown, went home and shot and killed Schwegel, returned to the bars, then talked to the officers in an attempt to establish an alibi before he again returned home and shot himself.

Gambrel had suffered two gunshot wounds. One was a grazing soft tissue injury to the chin. The other bullet entered under his chin, passed through the floor of his mouth, palate, nose and sinus, and exited between his eyes on the forehead. Two doctors testified at trial that Gambrel's injuries were consistent with self-inflicted gunshot wounds. Sagen testified that Gambrel had once bragged to him that he had been to a mercenary school where he had learned how to shoot people without killing them. The doctors did not find any injury to the back of Gambrel's head from being knocked unconscious. Also, Gambrel could not explain why his jacket was found neatly folded on the sofa in the apartment.

Gambrel had been seen at various downtown Whitefish bars all evening on February 4-5 except for a period of about an hour beginning at 10 or 11 p.m. Witnesses testified that Gambrel was "very intoxicated" and "scary," and that he said he was planning to leave Schwegel and was angry with her. Gambrel denied making

those statements and testified that he and Schwegel were very happy together.

Over the defense's objection, the State presented testimony of three women with whom Gambrel had lived at various times. Alane Shuster testified about incidents in which Gambrel had physically abused her, culminating on Christmas Eve 1984. She stated that after they ate dinner, Gambrel tied her, naked and under protest, spread-eagle to a bed, then stuffed cut-up pieces of potato into her vagina. She testified that he watched her cry and beg him to stop for about ten minutes, then went to sleep on the couch, leaving her tied up. She later freed herself, but did not tell anyone about the incident because she was humiliated and embarrassed.

The second woman, Shelly Birky, testified that she allowed Gambrel to use a room in her apartment during the fall of 1986. She testified that she awoke at 5:30 a.m. on Christmas morning to find him on top of her having intercourse. She testified that as she tried to get away, he slammed her against walls, hit her, and repeated, "I will kill you; I will kill you; I will kill you." She testified that she reported the incident to the police.

Kathryn Jinx Kinslow testified about a Halloween 1987 incident in which Gambrel chased her around her apartment and slapped her, then slashed her waterbed. She testified that he told her, "I am going to kill you, you are a dead woman, you are not going to be

5

alive tomorrow morning. Don't even bother going to sleep, because you are not going to live through to morning. You are not even worth living. I am going to take a knife and slit you from your cunt all the way up." Kinslow filed a police report.

All three women were extensively cross-examined. Gambrel denied making any of the threatening statements and, aside from admitting that he had an argument with Kinslow on Halloween of 1987, denied that any of these incidents occurred.

Gambrel was found guilty of deliberate homicide and was sentenced to 100 years in prison plus 10 years for use of a dangerous weapon.

I

Did the District Court err in denying the defendant's motion in limine and admitting into evidence the testimony of Alane Shuster, Shelly Birky, and Kathryn Jinx Kinslow?

In State v. Just (1979), 184 Mont. 262, 602 P.2d 957, this Court set out specific requirements which must be met before evidence of other crimes, wrongs, or acts will be admissible under Rule 404(b), M.R.Evid. The requirements are:

1. Similarity of crimes or acts; and

2. nearness in time; and

3. tendency to establish a common scheme, plan or system; and

4. the probative value of the evidence is not substantially outweighed by the prejudice to the defendant.

<u>Just</u>, 602 P.2d at 961. In addition, the State must give the defense advance notice of its intent to use such evidence and the jury must be admonished that the purpose of the evidence is limited. <u>Just</u>, 602 P.2d at 963-64.

In this case, the State gave pretrial notice of its intent to present the testimony of four women (one did not appear at trial). The defense made a motion in limine to prevent the women from testifying. After reviewing the women's written statements and hearing oral argument on the motion, the court ruled that the commonality among the offered testimony was

> being females who have cohabitated with Defendant for significant periods of time and have been physically attacked, to varying degrees, by the Defendant while he was in a state of intoxication. They have also been subjected to threats of further harm or death by the Defendant while he was in an apparent alcoholic rage.

The court also ruled that the acts were not so remote in time as to be irrelevant or immaterial, that they were sufficiently similar as violent acts, and that their probative value outweighed their prejudicial effect. It denied the defendant's motion in limine. The defense again argues here that the other acts disclosed in the testimony of the three women were not similar to deliberate homicide, were too remote in time, did not establish a common scheme, plan, or system, and were prejudicial beyond their probative value.

7

The defense argues that, in particular, testimony about Gambrel's previous "bizarre sexual behavior" is not similar to the crime charged here. Gambrel's act of tying up an unwilling Shuster and stuffing potatoes into her vagina, then leaving her in that state while he fell asleep on the couch, did involve sexual organs and may thus be described as "bizarre sexual behavior." However, that act, like rape, is more accurately characterized as violent or sadistic than as sexual behavior. Like the violence against Schwegel, it was apparently unprovoked and occurred after Gambrel had been drinking. It is not true, as the defense argues, that the acts must have been perpetrated against the same victim to be similar. See State v. Tecca (1986), 220 Mont. 168, 714 P.2d 136. We conclude that the violent behavior against Shuster, especially when looked at in combination with the testimony of the other women, is sufficiently similar to the violent behavior of shooting Schwegel to have been admissible into evidence.

Similarly, we conclude that the rape of the sleeping Birky followed by death threats against her and the slapping, property destruction, and death threats against Kinslow are sufficiently similar to the crime charged here. We agree with the District Court that the similarities are in the nature of Gambrel's relationships with the victims, that he had been drinking before each incident, and that he was violent and/or threatened deadly violence each time.

The acts about which the three women testified occurred between two and four years before Schwegel was killed. This Court has allowed evidence of events which occurred nine years prior to the charged acts, when "there is a continuing pattern of similar conduct." Tecca, 714 P.2d at 139. Here, there was a continuing pattern of violence against the women with whom Gambrel was living. We conclude that the acts were not too remote in time to be admissible into evidence.

We next address the presence of a common scheme, plan, or system. The evidence shows a common system of violence, after Gambrel had been drinking and directed against his partners, including death threats, sexual assaults, beatings, and murder. As in Tecca, "we find the number and similarity of incidents tends to establish a common scheme or plan under the third prong of the Just test." Tecca, 714 P.2d at 139.

Finally, we consider whether the "other crimes" evidence was prejudicial beyond its probative value. In a different case, testimony about the acts disclosed by the three women might be too prejudicial. Here, Gambrel was charged with deliberate homicide. The prejudicial effect of the testimony against him must be viewed in light of the seriousness of that charge. Further, the probative value of the testimony by the three women must be viewed in light of the absence of any eyewitnesses to this crime. We conclude

that the District Court was correct in ruling that the probative value of the testimony outweighed its prejudicial effect.

After considering the four <u>Just</u> factors, we conclude that the State has met its burden. We hold that the District Court did not err in denying the motion in limine.

## II

Did the court err in denying the defendant's motions for a mistrial?

Defendant moved for a mistrial at the conclusion of each of the three women's testimony. At the conclusion of Shuster's testimony, he cited her statements that he was a thief, that he was obsessed by Rambo movies, and that she had to bail him out of jail for an unrelated matter. The defense did not object to any of this testimony at the time it was given. The testimony was nonresponsive to the questions asked by the State's attorney, who quickly interrupted the testimony about thievery.

The reason for the motion for a mistrial at the conclusion of Birky's testimony was that she had stated that Gambrel was a thief and that he was banned from certain bars. Following a defense objection, the court gave a curative instruction as to the thief testimony. The State's attorney interrupted the "banned at bars" testimony before the witness could complete her statement.

The defense moved for a mistrial at the conclusion of Kinslow's testimony because she stated that Gambrel had agreed to

get counseling for drug and alcohol problems. No objection was made at the time this testimony was given.

Our standard of review of a denial of a motion for mistrial is evidence that is "clear, convincing, and practically free from doubt, of the error of the trial court's ruling." State v. Counts (1984), 209 Mont. 242, 247-48, 679 P.2d 1245, 1248 (citation omitted). We conclude that this standard has not been met. The court did not err in denying the motions for mistrial.

III

Did the court err in denying the defendant's motion for a new trial?

Gambrel's motion for a new trial was based on the same arguments he used in his motion in limine and in his motions for mistrial. He also cited State v. Heinrich (Mont. 1990), 788 P.2d 1346, 47 St.Rep. 314, modified, 794 P.2d 696, which had just been decided.

Heinrich was originally charged with assault and criminal possession of dangerous drugs, both felonies. The State gave notice, as required under Just, of its intent to introduce evidence of other crimes, namely a previous guilty plea to possession of dangerous drugs, a previous conviction of the offense of intimidation, and evidence concerning a seizure of dangerous drugs from Heinrich's trailer. Before trial, Heinrich entered a guilty plea to the charge of possession of dangerous drugs. Therefore, he was

11

tried only on the assault charge. However, the trial court let in the other crimes evidence. This Court held that none of the evidence of other crimes should have been admitted because it was not related or similar and was too remote in time. Heinrich, 788 P.2d at 1350-51.

The defense argues that this Court's opinion in Heinrich renders the admission of the testimony of the three women inadmissible in this case. We disagree. The two cases are obviously factually distinguishable, and the Just factors are fact-dependent.

Granting or denying a motion for new trial is within the discretion of the trial court. Section 46-16-702(1), MCA; State v. Brush (1987), 228 Mont. 247, 252, 741 P.2d 1333, 1336. For the reasons discussed above under Issues I and II, we hold that the District Court did not abuse its discretion in denying the motion for a new trial in this case.

Affirmed.

_____
Chief Justice

We concur:

_____
_____
_____
Justices

12

Justice R. C. McDonough dissents.

The fourth requirement of the _Just_ rule (See State v. Just (1979), 184 Mont. 262, 602 P.2d 957) relative to the admissibility of evidence of other crimes, wrongs or acts has by the majority opinion lost practically all of its usefulness. Such requirement is as follows: "the probative value of the evidence is not substantially outweighed by the prejudice to the defendant." _Just_, 602 P.2d at 961.

Here the defendant was charged with deliberate homicide of the woman he lived with by shooting her five times with a rifle. It is the relationship of this charge with the testimony of the witnesses Alana Shuster, Shelly Birky, and Katherine Jinx Kinslow which is in question.

Their testimony relative to the other requirements of _Just_ is questionable; for example, similarity of crime or acts. However, allowing Alana Shuster to testify to the defendant's placement of the potatoes, a sexually perverted attack, is practically a guarantee of the criminality of the defendant's character, his loathsomeness and his fitness for conviction of the crime charged. The same can be said of the testimony of Shelly Birky as to the act of rape. The testimony as to such physical assaults on Ms. Shuster and Birky, should have been at the very least limited in detail to lessen the extreme prejudicial effect. Evidence admitted under the _Just_ rule is by its nature somewhat prejudicial and should be carefully weighed as to its probative value. In essence Rule 404(b), provides that evidence of other crimes, wrongs or acts is

13

not admissible to show character of a defendant.  The reason for this rule is that the jury should judge the defendant on the facts and law relevant to the actual crime charged and not on his character traits or that he is a "bad man."  I would reverse and remand for a new trial.

_____
Justice

Justice Wm. E. Hunt, Sr. and Justice John C. Sheehy concur in the foregoing dissent.

_____
_____
Justices

14