No. 93-558

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

SHAWN MATTHEW CLINE,

      Defendant and Appellant.

FILED

JAN 18 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Herman A. Watson, III, Watson & Watson,
          Bozeman, Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General,
          John Paulson, Assistant Attorney General,
          Helena, Montana

          Mike Salvagni, Gallatin County Attorney,
          Marty Lambert, Deputy County Attorney,
          Bozeman, Montana

Submitted on Briefs:  December 7, 1995

Decided:  January 18, 1996

Filed:

_____
Clerk

Justice Charles E. Erdmann delivered the opinion of the Court.

Defendant Shawn Matthew Cline appeals from a jury verdict of the Eighteenth Judicial District Court, Gallatin County, finding him guilty of robbery, aggravated assault, and burglary. We reverse and remand.

The issues on appeal are as follows:

1. Did the District Court err in denying Cline's motion for a new trial based on newly discovered evidence?

2. Did the District Court err in admitting expert testimony concerning the age of Cline's fingerprint?

3. Did the District Court err in allowing testimony concerning the origin of tire tracks at the crime scene?

Our holding on Issue 1 is dispositive. As we are remanding to the District Court for a new trial, we address the evidentiary matters raised in Issues 2 and 3.

FACTS

At approximately 4:40 a.m. on the morning of October 12, 1992, Jim Storey went to the Kountry Korner Cafe west of Bozeman in order to prepare the cafe for opening. Storey is a local farmer-rancher who had been given the key to the cafe by the owner, Betty Nason in order to turn on the grills and make coffee prior to the cafe's 6:00 a.m. opening.

As Storey approached the back of the cafe, he noticed there was a hole in the door where the deadbolt had been. He heard an acetylene torch burning as he entered the cafe and saw an acetylene

2

torch tank on a cart with hoses leading into the office. Storey tried to get into the office but could not open the door. He stepped back from the door and said "Get the hell out of there." A few seconds later a man came out of the office holding his hand in front of his lower face. Storey described the man as somewhat shorter than himself with long, dark brown hair. The man approached Storey, struck him on the head with a hammer and fled the scene.

When Storey regained consciousness he called 911. He was taken to a Bozeman hospital and later flown to Billings for treatment. Based on Storey's description of the assailant, Lieutenant Robert Christie of the Gallatin County Sheriff's Department assembled a photo line-up which he showed to Storey in the hospital. The line-up included a photo of the defendant, Shawn Matthew Cline. Storey covered the lower portion of each face and then identified Cline based on his hairstyle and eyes. At trial, Storey testified that Cline's hairstyle and build were similar to his assailant's, but he could not make a positive identification.

The sheriff's office was unable to obtain identifiable latent fingerprints from the crime scene. Nason discovered that the cash drawer had been damaged in the burglary and would not fit back into the cash register. She ordered a new cash drawer and removed the register and old drawer to a storage shed behind the cafe. When the new cash drawer arrived it did not have a money tray so Nason retrieved the tray from the old drawer. At that point she

3

discovered an envelope underneath the money tray which had not been found by the sheriff's deputies. The envelope was used to keep deposits for pie tins when customers purchased pies. Using a magnetic powder, Christie was able to raise a latent fingerprint from inside the flap of the envelope. The print was that of Cline's right thumb.

When interviewed by Christie, Cline stated that he had previously washed dishes at the cafe but had not worked there in over a year. He indicated he had not been in the cafe for two or three months. He said he had never taken any money from customers and had never entered the till. He could think of no reason why his fingerprint would be on the envelope. Nason confirmed that Cline had washed dishes a few times at the cafe but that he had no reason to work the cash register or handle money, including that involved with the pie tin deposit envelope.

Cline contacted Christie after the initial interview and told him that he had given his sister-in-law, Roxanne Cline an envelope not long before the burglary. Roxanne worked at the cafe and Cline claimed this could explain the presence of his fingerprint on the envelope. Roxanne testified that Cline had never given her an envelope. Cline also claimed he had first learned of the burglary while stopping at a service station across the street from the cafe on the morning of the crime. The owner of the service station testified that he did not see or talk with Cline that morning.

4

On November 16, 1992, Cline was charged with robbery pursuant to § 45-5-401, MCA (1991), aggravated assault pursuant to § 45-5-202, MCA (1991), and burglary pursuant to § 45-6-204, MCA (1991). Cline relied on an alibi defense, claiming he had spent the early morning hours of October 11-12, 1992, with his wife, her brother, and a young friend.

Cline's first trial concluded on April 2, 1993, when the jury was unable to reach a verdict. On July 6, 1993, a second jury trial was commenced, and on July 12, 1993, the jury found Cline guilty on all three charges. On September 7, 1993, the District Court sentenced Cline to ten years imprisonment on each count to run concurrently, with three years suspended. The District Court added five years on each count to run consecutively for the use of a dangerous weapon.

On September 29, 1993, Cline filed a notice of appeal with this Court. On February 18, 1994, Cline filed a motion to stay the appeal and requested this Court to remand the case to the District Court for a determination as to whether he would be entitled to a new trial based on newly discovered evidence. In his motion, Cline alleged that a previously unknown witness had voluntarily come forward with information exculpating him (Cline) from the crimes. On March 15, 1994, we granted Cline's motion and remanded the case to the District Court for a hearing on the newly discovered evidence.

5

On July 8 and 12, 1994, the District Court conducted hearings on Cline's motion for discovery of the new evidence. On August 6, 1994, Cline filed a motion with the District Court for a new trial based on the newly discovered evidence. On September 8, 1994, the District Court conducted a hearing on the matter and on January 11, 1995, denied Cline's motion for a new trial. This appeal followed.

ISSUE 1

Did the District Court err in denying Cline's motion for a new trial based on newly discovered evidence?

Granting or denying a motion for a new trial is within the discretion of the district court. Section 46-16-702, MCA; State v. Gambrel (1990), 246 Mont. 84, 91, 803 P.2d 1071, 1076. In State v. Lewis (1978), 177 Mont. 474, 483, 582 P.2d 346, 351, we held that "[t]he matter of granting or refusing a new trial for newly discovered evidence rests largely in the discretion of the District Court." (Citing Butler v. Paradise Valley Irr. Dist. (1945), 117 Mont. 563, 160 P.2d 481). Based on the nature of the newly discovered evidence, we must determine whether the District Court abused its discretion in denying Cline's motion for a new trial.[1]

---

[1]In view of our recent decision in State v. Gollehon (Mont. 1995), 52 St. Rep. 1182, regarding the time requirements for filing motions for new trial under § 46-16-702, MCA, and our retention of two judicially created exceptions to that rule, it is appropriate that we point out that the issue of the timeliness of Cline's motion for new trial was neither raised in the District Court nor in this Court on appeal and, accordingly, we decline to address that issue here. Moreover, our order staying Cline's appeal and remanding his motion to the District Court for consideration was entered well before our decision in Gollehon and was consistent with our decisional law then in effect.

6

After Cline's conviction he became aware that another individual had allegedly admitted to committing the offenses for which he had been convicted. On February 18, 1994, Dwaine Cline, Cline's cousin who was serving a sentence for misdemeanor theft, filed a sworn affidavit indicating that James Leroy Smith, a convicted felon, had told him that he (Smith) had committed the Kountry Korner Cafe burglary, robbery and assault on October 12, 1992. Dwaine also stated in his affidavit that Sergeant Robert Campbell of the Gallatin County Sheriff's Department had told him that he had received information from a reliable source in Billings that Smith was the one who had broken into the Kountry Korner Cafe.

Campbell testified at the hearing in July 1994 that in October 1993 he had received information from a private detective, Charles Easterday, indicating that word was out that Smith was involved in the Kountry Korner Cafe crimes. Easterday told Campbell that his source for the information was Harold Lesh, an informant previously used by the Sheriff's Department. Lesh was unavailable to testify by the time the hearings were conducted in July and September 1994. Campbell testified that he had also received a second telephone call from an anonymous source at about the same time indicating that Smith was involved in the Kountry Korner Cafe robbery. Easterday testified at the hearing on the new trial motion that an unidentified customer of a Bozeman pawn shop told him that Smith had committed the crimes for which Cline had been convicted.

7

In summary, months after his conviction in July 1993, Cline uncovered four sources--Dwaine Cline, Campbell, Lesh, and Easterday--all providing information that Smith had committed the crimes for which Cline had been convicted and sentenced. Faced with this new evidence, Cline requested that this Court stay his appeal and filed a motion for discovery seeking details on the exculpatory information which Cline believed the authorities possessed. The county attorney responded in writing to Cline's request by stating "there is absolutely nothing exculpatory for your client . . . ." The State's position was and still is that the newly discovered evidence merely suggests an additional suspect and does not exculpate Cline.

The District Court relied on our long-standing criteria set forth in State v. Greeno (1959), 135 Mont. 580, 342 P.2d 1052, to evaluate Cline's motion for a new trial based on the newly discovered evidence. The Greeno criteria are: (1) the evidence must have come to the knowledge of the defendant since trial; (2) it was not through want of diligence that the evidence was not discovered earlier; (3) the evidence is so material that it would probably produce a different result upon another trial; (4) the evidence is not merely cumulative--that is, it does not speak as to facts in relation to which there was evidence at trial; (5) the motion for new trial must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; and (6) the evidence must not be such as

8

will only tend to impeach the character or credit of a witness. All six criteria must be met or the defendant's motion will fail. State v. Arlington (1994), 265 Mont. 127, 149, 875 P.2d 307, 320, (citing State v. Cyr (1987), 229 Mont. 337, 340-41, 746 P.2d 120, 122-23).

The District Court determined that Cline's newly discovered evidence satisfied criteria 1, 2, and 5, and that criteria 6 was not applicable. The court concluded, however, that the evidence failed to meet the requirements of criteria 3 and 4.

In evaluating criteria 3, the District Court determined that the proposed evidence was not so material that it would probably produce a different result at a new trial. The court noted that the anonymous telephone call to Campbell and the information from the unidentified man who spoke with Easterday in the pawn shop was hearsay. The court acknowledged that Smith's alleged confession of the crimes might be admissible as a prior inconsistent statement under Rule 801(d)(1)(A), M.R.Evid., if he denied such an admission at a new trial. Nevertheless, the District Court determined that such testimony would merely present the jury with the task of determining and weighing the credibility of those who might testify. The court concluded that Dwaine was not a credible witness and that neither his testimony nor that of Smith and/or Lesh was so material that it would result in Cline's acquittal at a new trial.

9

In evaluating criteria 4, the District Court determined that evidence indicating Smith committed the crimes would merely be cumulative evidence of Cline's denial of the charges. The court determined that Cline did not demonstrate that the new evidence "does not speak as to facts in relation to which there was evidence at trial." (Citing Greeno, 342 P.2d at 1055.)

We do not agree with the District Court's conclusion that the newly discovered evidence fails to satisfy criteria 3 and 4 of the Greeno test. The new evidence, discovered well after trial due to no lack of due diligence on Cline's part, is more than cumulative of what was presented to the jury. Smith's purported confession and the other evidence which points to his commission of the crimes is new and distinct from any evidence presented at trial. The new evidence tends to exculpate Cline and speaks to facts which were not evident at trial. While we agree with the District Court that essentially it may boil down to a question of witness credibility, such a determination should remain within the province of the jury and not the court.

The jury in Cline's first trial could not reach a verdict based on the evidence presented. The jury in the second trial convicted Cline based on circumstantial evidence, except for Cline's fingerprint on the deposit envelope, and despite the fact that Storey was unable to make a positive identification of the perpetrator. Subsequent to the second trial, Cline obtained newly discovered evidence material to his case and exculpatory in nature

10

which the jury did not have the opportunity to consider in reaching its verdict. The newly discovered evidence is so material that it would probably, albeit not necessarily, produce a different result at another trial.

We determine that the newly discovered evidence satisfies all six Greeno criteria, and therefore, we conclude that the District Court abused its discretion in denying Cline's motion for a new trial. Accordingly, we reverse the District Court on this issue and on this basis remand the case to the District Court for a new trial.

ISSUE 2

Did the District Court err in admitting expert testimony concerning the age of Cline's fingerprint?

During the second trial, the District Court allowed Michael Wieners, a FBI fingerprint technician, to testify as to the age of Cline's fingerprint found on the pie tin deposit envelope. Wieners testified that "I think this is a fresh latent print probably about a month or two old. But, again, there is leeway either way." Cline claims that because there is no reliable scientific procedure to evaluate the age of a fingerprint, Wieners' testimony significantly undermined his defense theory that the fingerprint was laid prior to the break-in under innocuous circumstances unrelated to the break-in.

Cline supports his position with an affidavit from Andre Moenssens, a law professor and consultant on fingerprint

11

identification, whose opinion rebuts Weiners' testimony that it is possible to determine the age of a fingerprint. Cline, however, presented Moenssens' affidavit to the court after the trial in support of his motion for a new trial. The District Court refused to consider the information contained in the affidavit by concluding that Cline could have discovered the information through due diligence before or during trial. In any event, Cline argues on appeal that the prejudicial affect of Wieners' testimony outweighed the probative value of the information. Cline further argues that Wieners' testimony did not meet the criteria for the introduction of scientific evidence in criminal cases.

The State acknowledges that this Court has adopted the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 113 S. Ct. 2786, 125 L. Ed. 2d 469, in determining whether to allow expert testimony concerning novel scientific evidence. See State v. Weeks, (1995), 270 Mont. 63, 891 P.2d 477; State v. Moore (1994), 268 Mont. 20, 885 P.2d 457. However, the State correctly notes that Daubert was decided just prior to the commencement of Cline's second trial. This Court did not formally adopt the Daubert standard until Moore was decided in November 1994, over a year after Cline was convicted. The State relies on State v. Walters (1991), 247 Mont. 84, 806 P.2d 497, and Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 657 P.2d 594, for its argument that the District Court did not abuse its discretion in allowing Wieners' testimony.

12

This Court has adopted the general rule that judicial decisions are to be applied retroactively. McNeil v. Currie (1992), 253 Mont. 9, 830 P.2d 1241.

It must also be noted that we do not consider fingerprint evidence in general to be novel scientific evidence. However, in the present case the issue is whether it is possible to determine the age of a fingerprint utilizing magnetic powder. We apply the Daubert standard to this case because we consider fingerprint aging techniques in this context to be novel scientific evidence. Certainly all scientific expert testimony is not subject to the Daubert standard and the Daubert test should only be used to determine the admissibility of novel scientific evidence.

When we adopted the Daubert test in Moore, we specifically noted the continuing vitality of Barmeyer as that case pertained to the scientific evidence. In Barmeyer we held that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." Barmeyer, 657 P.2d at 598 (quoting United States v. Baller (4th Cir. 1975), 519 F.2d 463, 466, cert. denied, 423 U.S. 1019, 96 S. Ct. 456, 46 L. Ed. 2d 391). In Barmeyer, we rejected the "general acceptance" test, holding that it was not in conformity with the spirit of the new rules of evidence. Barmeyer, 657 P.2d at 598.

In Daubert, the United States Supreme Court also rejected the "general acceptance" standard in favor of the more liberal test

13

embodied in Rule 702, Fed.R.Evid. This test requires the trial judge to determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Moore, 885 P.2d at 470 (citing Daubert, 113 S. Ct. at 2796). We noted that Rule 702, Fed.R.Evid., still requires the district court to screen such evidence to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Moore, 885 P.2d at 470.

To guide the trial court's assessment of the reliability of the scientific evidence offered, we adopted in Moore the following four nonexclusive factors: (a) whether the theory or technique can be and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (d) whether the theory or technique has been generally accepted or rejected in the particular scientific field. Moore, 885 P.2d at 470-71 (citing Daubert, 113 S. Ct. at 2796-97).

In adopting the Daubert test, we concluded that "before a trial court admits scientific expert testimony, there must be a preliminary showing that the expert's opinion is premised on a reliable methodology." Moore, 885 P.2d at 471. We noted, however, that such an inquiry must remain flexible.

14

> "Not every error in the application of a particular
> methodology should warrant exclusion. An alleged error
> in the application of a reliable methodology should
> provide the basis for exclusion of the opinion only if
> that error negates the basis for the reliability of the
> principle itself."

Moore, 885 P.2d at 471 (quoting United States v. Martinez (8th Cir. 1993), 3 F.3d 1191, 1198).

In this case, the State established the necessary foundation regarding the issue of determining the age of fingerprints. Wieners referenced and quoted a number of scientific treatises on fingerprint technology. The treatises established that while the age of a latent print cannot be established with complete accuracy, experienced examiners can proffer an opinion regarding the age of a latent print based on the examiner's experience and investigation. The District Court, although not applying the Daubert criteria, correctly found that this was an area where experts could disagree, that the testimony would be subject to cross-examination, and that the credibility of the witnesses and the weight of their testimony should be for the jury to decide, not the court. Rulings on the admissibility of evidence are left to the sound discretion of the trial court. Moore, 885 P.2d at 471 (citing State v. Stewart (1992), 253 Mont. 475, 479, 833 P.2d 1085, 1087). We conclude that the District Court did not abuse its discretion in allowing Weiners' testimony regarding the age of the fingerprint.

ISSUE 3

Did the District Court err in allowing testimony concerning the origin of tire tracks at the crime scene?

The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

The State called Frank Kountz as a witness during trial. Kountz is the general manager of a garbage collection company which provided service to the Kountry Korner Cafe during October 1992. Kountz testified that his company uses twin axle garbage trucks which leave dual tire tracks on both sides of the vehicle. Kountz also testified on direct examination that his company serviced the cafe on Mondays and Fridays. The prosecutor asked no further questions of Kountz.

On cross-examination, Cline asked Kountz specifically about the morning of October 12, 1992. Kountz testified that he was not personally present when the truck made its stop and that he was relying on a company route sheet which had not been offered into evidence. Cline then objected to Kountz's testimony as being hearsay and requested the court to strike the testimony. The objection was overruled.

On appeal, Cline contends that the District Court committed reversible error by admitting Kountz's testimony. Cline claims Kountz did not have personal knowledge as to whether garbage was

16

hauled away from the cafe on the morning of October 12, 1992, nor did he have a legitimate business record confirming such a stop. Cline argues that the State intended to use Kountz's testimony in its closing argument to show that the dual tire tracks found at the crime scene were those of the garbage truck, thus refuting Cline's argument that someone other than himself with access to a vehicle with dual tire tracks had committed the crime.

The State counters that it did not present any evidence concerning the tire tracks found at the crime scene or make any reference to the tire tracks in its closing argument. The State points out that the only other mention of the dual tire tracks came on Cline's cross-examination of Christie who admitted that photographs of the tire tracks had not been compared to the garbage truck and that the tracks could have been made by the person who burglarized the cafe. The State argues that Cline may not predicate a claim of error on the admission of testimony which he himself elicited. Since this case is being remanded for a new trial on newly discovered evidence grounds, it is somewhat speculative as to whether the tire track issue will arise in the new trial. Nevertheless, since both parties briefed the issue and since it may arise in any new trial we will briefly address the issue.

Since Cline himself elicited the alleged hearsay testimony, we conclude that he cannot argue on appeal that its admission constitutes reversible error. Furthermore, our review of the

17

record fails to indicate any relationship between the alleged hearsay testimony and any element of the offenses for which Cline was convicted. We have stated that "'[o]nly if there was a reasonable possibility that inadmissible evidence might have contributed to the conviction is there reversible error.'" State v. Earl (1990), 242 Mont. 279, 283, 790 P.2d 464, 466 (quoting State v. Brush (1987), 228 Mont. 247, 251, 741 P.2d 1333, 1335). We therefore conclude that even if the admission of the testimony was error, it was harmless error.

In conclusion, we note that Cline also appealed the District Court's denial of his motion for a directed verdict made at the closing of the State's case-in-chief. As we are remanding the case back to the District Court for a new trial, we determine this issue to be moot. We conclude the District Court abused its discretion in denying Cline's motion for a new trial based on newly discovered evidence. We remand this case to the District Court for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____

_____

18

Troy Trieweiler

W. William Leaphart
Justices