JUSTICE NELSON
concurs.
¶60 I concur in our Opinion because the trial court correctly followed Montana law as it presently exists. I write separately to point out the errors in that law and to urge correcting our case law and amending Rule 702, M.R.Evid.
A. The Federal Trilogy
¶61 In 1993, the United States Supreme Court decided the first of what was to be a trilogy of cases dealing with the admissibility of expert testimony. In Daubert v. Merrell Dow Pharm., Inc. (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, the Court held that Federal Rule of Evidence 702 requires that expert scientific evidence be subject to a reliability test, rather than the common law “general acceptance” test of Frye v. United States (D.C. Cir. 1923), 293 F. 1013, *316 1014. Daubert, 509 U.S. at 589-90, 113 S.Ct. at 2794-95. The Frye test was superseded by Rule 702. Daubert, 509 U.S. at 589, 113 S.Ct. at 2794. Accordingly, the Court required that, when faced with a proffer of expert scientific testimony, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony’s underlying reasoning and methodology is scientifically valid and can be properly applied to the facts at issue. Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796. This is referred to as the courts’ “gatekeeping” function. Daubert, 509 U.S. at 597, 113 S.Ct. at 2798.
¶62 The Court set forth various, flexible considerations that will bear on this inquiry, including, whether the theory or technique in question can be (and has been) tested; whether it has been subjected to peer review and publication; its known or potential error rate and the maintenance of standards controlling its operation; and whether it has attracted widespread acceptance within the relevant scientific community. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97. The Court observed that the inquiry is to be a flexible one, focusing solely on principles and methodology, not on the conclusions they generate, and being mindful of other applicable Rules. Daubert, 509 U.S. at 594-95, 113 S.Ct. at 2797. Finally, the Court stated that cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion under an uncompromising general acceptance standard, is the appropriate means by which evidence based on valid principles may be challenged. Daubert, 509 U.S. at 596, 113 S.Ct. at 2798.
¶63 The second case in the trilogy was General Electric Co. v. Joiner (1997), 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508. In Joiner, the Court clarified Daubert in two respects. First the Court noted that trial courts could scrutinize the reliability of a proffered expert’s reasoning process as well as his or her methodology. The Court stated that “nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Joiner, 522 U.S. at 146, 118 S.Ct. at 519. Second, Joiner made clear that abuse of discretion is the proper standard by which an appellate court should review a district court’s decision to admit or exclude expert scientific evidence. Joiner, 522 U.S. at 146, 118 S.Ct. at 519.
¶64 The final of the three cases was Kumho Tire Co., Ltd. v. Carmichael (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. In this case the Court applied Dauberts gatekeeping obligation to not only expert scientific evidence, but, as well, to all expert testimony. *317 Kumho Tire, 526 U.S. at 141, 119 S.Ct. at 1171. Furthermore, the Court emphasized the importance of the gatekeeping requirement, noting that “[t]he objective of that requirement is to ensure the reliability and relevancy of expert testimony [and] to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176.
B. Montana’s Approach
¶65 Montana did away with the Frye general acceptance test before Daubert. In Barmeyer v. Mont. Power Co. (1983), 202 Mont. 185, 193, 657 P.2d 594, 598, we rejected the Frye test as not being ‘in conformity with the spirit of the new rules of evidence.” We adopted the reasoning of United States v. Bailer (4th Cir. 1975), 519 F.2d 463, 466, wherein the Fourth Circuit Court of Appeals held that ‘It is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.” Barmeyer, 202 Mont. at 193-94, 657 P.2d at 598. Nearly twelve years later, we adopted Daubert, concluding that ‘before a trial court admits scientific expert testimony, there must be a preliminary showing that the expert’s opinion is premised on a reliable methodology.” State v. Moore (1994), 268 Mont. 20, 42, 885 P.2d 457, 471.
¶66 Unfortunately, we also stated that the Daubert guidelines were consistent with Barmeyer concerning the admission of‘hovel scientific evidence.” Moore, 268 Mont, at 42, 885 P.2d at 471. I say “unfortunately” because, as it turns out, we have, since, essentially done away with the Daubert standards by limiting the requirements of that case and the courts’ gatekeeping obligation to proffered expert testimony of “novel” scientific evidence only. See State v. Cline (1996), 275 Mont. 46, 55, 909 P.2d 1171, 1177; Hulse v. State, 1998 MT 108, ¶¶ 55-69, 289 Mont. 1, ¶¶ 55-69, 961 P.2d 75, ¶¶ 55-69; State v. Southern, 1999 MT 94, ¶ 59, 294 Mont. 225, ¶ 59, 980 P.2d 3, ¶ 59; Gilkey v. Schweitzer, 1999 MT 188, ¶¶ 18-20, 295 Mont. 345, ¶¶ 18-20, 983 P.2d 869, ¶¶ 18-20; State v. Hocevar, 2000 MT 157, ¶ 56, 300 Mont. 167, ¶ 56, 7 P.3d 329, ¶ 56; State v. Ayers, 2003 MT 114, ¶ 37, 315 Mont. 395, ¶ 37, 68 P.3d 768, ¶ 37. See also Robert L. Sterup, Into the Twilight Zone: Admissibility of Scientific Expert Testimony in Montana after Daubert, 58 Mont. L. Rev. 465, 485-86 (Summer 1997) (hereinafter Sterup).
*318 ¶67 In doing so, we have committed an error of logic. The proposition that “A implies B”is not the equivalent of “non-A implies non-B,” and neither proposition follows logically from the other. The process of inferring one from the other is known as the fallacy of “denying the antecedent.” Crouse-Hinds Co. v. InterNorth, Inc. (2nd Cir. 1980), 634 F.2d 690, 702-03 (citing J. Cooley, A Primer of Formal Logic 7 (1942)). In Cline, we committed this error when we essentially reasoned that if‘hovel” scientific evidence requires a Daubert hearing, then non-‘hovel” scientific evidence does not require a Daubert hearing. Cline, 275 Mont. at 55, 909 P.2d at 1177. Therefore, if the proffered scientific evidence is not ‘hovel,” our approach, based on Barmeyer, is to admit relevant scientific evidence in the same manner as other expert testimony, and to allow its weight to be attacked by cross-examination and refutation. Moore, 268 Mont. at 41-42, 885 P.2d at 470-71. See also Hulse, ¶ 69, Southern, ¶ 59, Hocevar, ¶¶ 56-61, and Ayers, ¶¶ 37-50.
¶68 While, arguably, the DNA evidence considered in Moore was ‘hovel” in 1994, as far as Montana was concerned, and while Daubert was consistent with Barmeyer (without applying Daubert’s various standards,per se), our “consistency’observation grew into an exception which has effectively now swallowed Daubert. Worse, as I will discuss later, in imposing this limitation we have not only turned the Daubert approach on its head, unreasonably constraining, in the process, the trial judge’s gatekeeping function, but we have rejected Kumho Tire[1], and have paved the way for the admission of “scientific” evidence whose reliability and methodology have never been subject to any level of intellectual rigor. Contra Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176. Indeed we have, as this case demonstrates, fallen in to the trap of admitting expert scientific opinion that is connected to existing data only by the ipse dixit of the expert, contra Joiner, 522 U.S. at 146, 118 S.Ct. at 519-the only exception being for that scientific evidence which *319 is not ‘hovel.’’[2] We have come to accept the notion that certain disciplines, techniques, methods, “sciences” and even some presumptions are grounded in scientific principle; are not ‘hovel;” and are, therefore, presumptively reliable without more. It is to that problem that I now turn.
C. The Error of our Ways
¶69 I start with two relatively simple examples.
¶70 Conventional wisdom declares that eyewitness testimony is reliable. Notwithstanding, this Court has acknowledged that a large body of research and scholarship exists which demonstrates that eyewitness testimony can be unreliable and that, in appropriate cases, the trial court must, therefore, allow expert testimony on the reliability of eyewitness testimony. State v. DuBray, 2003 MT 255, ¶¶ 36-44, 317 Mont. 377, ¶¶ 36-44, 77 P.3d 247, ¶¶ 36-44.
¶71 Similarly, §26-1-302, MCA, states that a witness is “presumed to speak the truth.” In civil cases the jury is so instructed. Montana Pattern Jury Instruction (Civil) 1.02. Montana is one of a few jurisdictions that still instructs civil juries that witnesses are presumed to speak the truth. Tom Singer, To Tell the Truth, Memory Isn’t That Good, 63 Mont. L. Rev. 337,349 (Summer 2002) (hereinafter Singer). Most courts, including the federal courts, do not so instruct juries because scholarship and research have shown that the presumption is not reliable. See Singer, at 349-57. Absent outright confabulation or perjury, witnesses will testify to what they believe is the truth. See Singer, at 360-63. However, any witness’s view of the “truth” is filtered through that person’s life experiences, biases and preconceptions along with his or her powers of observation, ability to retain and recall-processes which are highly dependent upon a host of psychological and physiological factors-and on one’s ability to communicate. See Singer, at 358-64. The “truth”may be the witness’s perceived, subjective understanding of what he or she saw or heard, or it may be the “truth” in some larger or more objective and absolute sense. See Singer, at 355-56.
¶72 Many times each year, we somberly intone the mantra: “credibility and weight given to the evidence is within the province of *320 the jury and will not be disturbed unless the jury’s findings are inherently impossible to believe.” Papich v. Quality Life Concepts, Inc., 2004 MT 116, ¶ 29, 321 Mont. 156, ¶ 29, 91 P.3d 553, ¶ 29. If we really believe that, we should not require the trial court to invade the province of the jury by instructing jurors that they must presume the truthfulness of the witnesses they hear testify. Ultimately it is up to them who and what to believe.
¶73 Criminal cases have the potential for generating even more serious evidentiary problems. Professors David E. Bernstein and Jeffrey D. Jackson state that
the admission of forensic evidence in criminal cases remains relatively routine. Legal commentators agree that the Daubert trilogy has had far less of a constricting effect on forensic science evidence compared with its effect on evidence in torts cases, most likely because defense attorneys in routine criminal cases lack the resources and expertise to challenge the admission of scientific evidence. Moreover, because all three cases in the Daubert trilogy arose in the civil context, lower courts seem more inclined to overcome their traditional inertia about admitting scientific evidence in that context.
David E. Bernstein & Jeffrey D. Jackson, The Daubert Trilogy in the States, 44 Jurimetrics J. 351 n.17 (Spring 2004). This potential for the routine admission of “scientific” evidence is precisely what Justice Patricia O. Cotter criticized in State v. Damon, 2005 MT 218, 328 Mont. 276, 119 P.3d 1194, (Cotter, P., dissenting), where she predicted that ‘ttjrial courts will admit the PBT [or, preliminary breath test] evidence because we have said it is admissible, its scientific validity having now been decreed as a matter of law. That is all that will matter.”[3] Damon, ¶ 63.
¶74 And, unfortunately, the case sub judice presents another example of the results of a “scientific” discipline being admitted through expert *321 testimony without application of a rigorous Daubert approach.
¶75 In her article, Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction ofReliability, 87 Va. L. Rev. 1723 (2001) (hereinafter Mnookin), Professor Jennifer L. Mnookin argues for the application of Daubert standards to expert forensic evidence in criminal cases in various sciences and disciplines that have been and are considered presumptively reliable.
¶76 Professor Mnookin observes that some long-accepted forensic science evidence has recently received greater public scrutiny not only because the “experts”proffering the evidence were either astonishingly inept or downright corrupt,[4] but also because of recent scientific developments such as DNA tests which have revealed the limitations of forensic techniques such as hair identification analysis. Mnookin, at 1725. Additionally, Professor Mnookin observes that several of the forensic sciences, including expert handwriting identification and fingerprint analysis, are now being criticized by historians, forensic watchdogs, and law professors who claim that these forensic techniques are not grounded in good science, that they have been inadequately tested, and that their methods have been insufficiently scrutinized. Mnookin, at 1725-26. She states:
Credible arguments have been leveled that these forms of evidence, though routinely used in courtrooms for a century or so, do not withstand scrutiny under Daubert. While no judge has yet excluded fingerprinting evidence on reliability grounds, courts are beginning to rein in handwriting experts.
Mnookin, at 1726-27.[5]
*322 ¶77 It is beyond the scope of this concurrence to exhaustively plumb the reliability (or unreliability) of handwriting comparison analysis. Professor Mnookin and the authorities she cites do an admirable job of that. Rather, a defense attorney must take this issue head on in an actual case, present the expert testimony on the reliability of handwriting comparison analysis, and write and argue the motion in limine. And it will take a trial court that is willing to listen to the evidence and rule on something more of a basis than that upon which courts have admitted handwriting identification testimony for years.
D. The Case Sub Judice
¶78 This should have been that case, but Clifford’s request for a Daubert hearing on Blanco’s testimony was denied. Under a correct application oí Daubert the court’s ruling would have been error. But the trial judge followed Montana law. And that brings me back to how we have jurisprudentially and improperly limited Daubert.
¶79 In the case at bar there was no showing that handwriting analysis is a "novel” science or discipline-even though Clifford had problems with how Blanco conducted his analysis. Although Daubert unmistakably covers not only the question of “field validity”-!.e., whether the expert information is within a valid category of expertise and whether there is a field of knowledge that has credible tools to produce valid answers to questions-Daubert also requires "method validity.” Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796. Method validity assumes the validity of the field, but answers the question of whether the methods used in the case were capable of producing valid answers. Daubert and Kumho Tire make method validity a prerequisite for the admission of expert evidence. Expert scientific testimony is admissible under Daubert only if it is the product of reliable principles and methods. Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796. In fact, Daubert, Joiner, and Kumho Tire all were concerned with method validity. Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796; Joiner, 522 U.S. at 146, 118 S.Ct. at 519; Kumho Tire, 526 U.S. at *323 152, 119 S.Ct. at 1176.
¶80 Under the trilogy of cases, Clifford was entitled to a Daubert hearing on Blanco’s testimony as to method validity. She, of course, did not get such a hearing because handwriting comparison is not deemed to be ‘hovel” scientific evidence, inasmuch as it has been admitted in court rooms in this State (and in other states) for years on the assumption it was a valid and reliable discipline.[6]
¶81 Because of the limitations we have jurisprudentially placed on Daubertdimitmg its application to ‘hovel”scientific evidence-Clifford’s concern that Blanco’s methodology did not produce valid results could not be the subject of a rigorous Daubert hearing. Rather, under Montana law her concerns would have to be addressed via BarmeyerA.e., through cross-examination and refutation; something she attempted to do with Mark Denbeaux’s testimony.
¶82 And there’s the anomaly. Since the field validity of handwriting comparison, as a discipline, was presumedfi.e., since it was deemed reliablfrthe court effectively determined that expert scientific evidence attacking the validity of Blanco’s methods was ‘hovel” and, therefore subject to Daubert. Thus, under Montana law, it would have been improper for the trial court to admit Denbeaux’s testimony in front of the jury without a pre-trial Daubert hearing. We’ve turned Daubert on its head.
E. Summary
¶83 In summary, under a correct application of Daubert, Clifford would have been entitled to a pre-trial Daubert hearing on the validity of Blanco’s methodology. However, because of the manner in which we have limited Daubert (to ‘hovel” scientific evidence), we placed Clifford in the anomalous position of having to request & Daubert hearing on Denbeaux’s testimony attacking Blanco’s methodology-it was Denbeaux’s theories that were, after all, ‘hovel.” Since handwriting analysis has long been recognized by courts as generally reliable and admissible, we forced upon Clifford the obligation to demonstrate that handwriting analysis, as a science or disciplinewersus the methodology involved-is unreliable.
¶84 As noted, Montana’s case law holds that subjecting expert testimony to the rigors of Daubert is necessary only when the science *324 or discipline at issue is ‘hovel.” We have erred in so limiting Daubert. We live in a world where scholarship and research are, in many cases, debunking conventional wisdom and assumptions about tests, analyses, disciplines and presumptions that the courts have long relied upon, have assumed are grounded in bedrock science and are, therefore, generally reliable.
¶85 If a litigant wants to challenge one of these tests, analyses or disciplines via Daubert-be it handwriting analysis, fingerprint analysis, or hair comparison-he or she should have the ability to do so, regardless of whether the test, analyses or discipline is ‘hovel.” Our limitation on the use of Daubert has put the onus on the challenger-like Clifford^» prove that a test, analyses, discipline or presumption which is presumed reliable-often for no other reason than that it has been in use or in the courts for a long period of time-is not, in fact, reliable; that it is invalid as a field. Indeed, under our approach, a litigantlike Cliffordhs precluded from attacking the methodology of one of these fields without first successfully attacking the reliability of the field itself.
¶86 This approach turns Daubert on its head; it severely constrains the trial court’s gatekeeping function; and it puts us out of sync with the federal courts. See Sterup, at 479-87. It is time we reconsider our application of Daubert and Barmeyer to expert testimony. The case at bar is a perfect example of why.
F. Recommendations
¶87 Specifically, we should overrule our case law to the extent that it limits the application of Daubert to ‘hovel” scientific evidence. Barmeyer, while consistent with Daubert as far as it goes, does not require the sort of rigorous pre-trial standards that should apply when expert evidence is proffered. Barmeyer may be appropriate for non-expert testimony. However, in my view, expert evidence is different than non-expert evidence. We all-jurors included-tend to trust experts, and if there are legitimate questions as to whether the field itself is bogus or whether the methods used by experts do not produce reliable results, then that testimony and evidence should be subject to challenge pre-trial. Many cases involve battles of experts. Neither side should have to contend with “expert” testimony that is unreliable.
¶88 Moreover, litigants who wish to challenge some of forensic science’s mainstays-handwriting comparison being the one at issue here-and the intellectual rigor of the “experts” who testify in those *325 fields, should have the ability to do so using Daubert. It may just turn out that handwriting comparison is not any more reliable than eyewitness testimony or the presumption that witnesses speak the truth. Our limitation of Daubert constrains the trial court’s gatekeeping function, and, as noted above, turns Daubert on its head.
¶89 We also need to adopt Kumho Tire in the appropriate case. There is no reason that, in Montana, Daubert should not also apply to all expert testimony, not just that involving expert scientific evidence.
¶90 Finally, we need to amend Rule 702, M.R.Evid. Federal Rule 702, regarding expert testimony, provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
(Emphasis added). Montana’s Rule 702, ends at the word “otherwise,” right before the italicized portion of the Federal Rule 702. We need to amend Montana’s rule to conform to the federal rule.
¶91 I concur because the trial court followed Montana law. It is that law that needs to be changed.
JUSTICE COTTER joins in the concurrence of JUSTICE NELSON.

 We have not had occasion to consider Joiner, but our standard of review of a trial court’s evidentiary rulings has historically been that of abuse of discretion. Moore, 268 Mont. at 36, 885 P.2d at 467. Whether that standard, or, where expert evidence is involved, a de novo standard of review is better, I leave to another day and another case. Furthermore, I leave to another case the question of whether the gatekeeper should focus its inquiry on simply the proffered scientific evidence at issue or on that evidence taken in the context of the totality of evidence offered.

 In fairness, I cannot claim too much moral high ground here, as I wrote Moore and authored and participated in other cited cases limitingDaubert to “novel” scientific evidence. In so doing, I will simply admit my error, having researched this issue further, and urge that we undo the mess we have collectively created.

 It bears mentioning that the underlying “science” involved in PBT instruments is not the problem. Rather, it is the lack of training, the failure to set rigorous calibration and testing standards and the actual field use of these instruments that contributes to their being unreliable for substantive evidence purposes. Unfortunately, it will now be a cold day in a hot place before any trial court in Montana refuses to accept PBT evidence in cases after Damon. We’ve declared such evidence reliable as a matter of law and underpaid, overworked and in many cases ill trained and unsophisticated defense attorneys are often not going to do the rigorous job of calling the witnesses and doing the cross-examination necessary to attack, not the science, but the methodology of PBT use. As Justice Cotter predicts, trial judges are simply going to admit PBT results as substantive evidence routinely; and, I predict, will just as routinely deny motions for Daubert hearings on PBT method validity.

 There are numerous examples in the literature but, to cite just a few, there is Fred Zain, a West Virginia forensic serologist who misstated or altered results in more that 130 cases. See In re an Investigation of the W. Va. State Police Crime Lab., Serology Div. (W.Va. 1993), 438 S.E.2d 501. Also, there is Ralph Erdmann, a Texas pathologist who was eventually convicted of felonies relating to autopsies that he botched and falsified. See Richard L. Fricker, Pathologist’s Plea Adds to Turmoil: Discovery of Possibly Hundreds of Faked Autopsies Helps Defense Challenges, 79 A.B.A. J. 24 (March 1993). And Montana has its own-Amold Melnikoff, formerly a forensic scientist with the State Crime Lab, whose testimony regarding hair analysis was called into question by subsequent DNA tests which exonerated several individuals who were convicted, in part, based on his testimony.

 See also, for example, United States v.Starzecpyzel (S.D.N.Y. 1995), 880 F. Supp. 1027, 1041-47, in which the court believed that the testimony failed Daubert, but admitted the testimony as non-scientific expert evidence, an approach that Kumho Tire would prohibit. Some judges have rejected handwriting comparison expertise: United States v. Brewer (N.D. Ill. 2002), 2002 WL 596365, at *8; United States v. Lewis (S.D.W.Va. 2002), 220 F. Supp. 2d 548, 554; United States v. Saelee (D. Alaska 2001), 162 F. Supp. 2d 1097, 1106. See also United States v. Crisp (4th Cir. 2003), 324 F.3d *322 261; United States v. Fleishman (9th Cir. 1982), 684 F.2d 1329. The realm of academia has produced vigorous debate about handwriting identification evidence: D. Michael Risinger, etal., Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification ‘Expertise,” 137 U. Pa. L. Rev. 731 (1989); D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: Daubert Meets Handwriting Identification Expertise, 82 Iowa L. Rev. 21 (1996); Andre A. Moenssens, Handwriting Identification Evidence in the Post-Daubert World, 66 UMKC L. Rev. 251 (1997); and D. Michael Risinger, et al., Brave New ‘Post-Daubert World” - A Reply to Professor Moenssens, 29 Seton Hall L. Rev. 405 (1998).

 This Court has not directly taken on the issue of the reliability of handwriting identification, but we have compared handwriting analysis to fingerprint analysis: State v. Bashor (1980), 188 Mont. 397, 414-15, 614 P.2d 470, 480.