No. 97-640

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 94

294 Mont. 225

980 P.2d 3

STATE OF MONTANA,

Plaintiff and Respondent,

v.

BLAIN SOUTHERN,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Edmund F. Sheehy, Jr., Helena, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Cregg W. Coughlin, Assistant Attorney General, Helena, Montana; Mike McGrath, Lewis and Clark County Attorney, Lisa Leckie, Deputy Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs: October 1, 1998

Decided: May 11, 1999

Filed:

No

_____

Clerk


Justice James C. Nelson delivered the Opinion of the Court.


**¶1. A jury in the District Court for the First Judicial District, Lewis and Clark County, convicted Defendant Blain Southern (Southern) of two counts of kidnaping, one count of burglary, one count of theft, and five counts of sexual intercourse without consent. The District Court sentenced Southern to a substantial term of years in prison and ordered that Southern be ineligible for parole. Southern appeals his convictions. We affirm.**

**¶2. We address the following issues on appeal:**

**¶3. 1. Did the District Court err in denying Southern's motion to sever the counts against him into four separate trials?**


**¶4. 2. Did the District Court err in denying Southern's motion *in limine* to preclude the State from offering microscopic hair comparison evidence at trial?**


**¶5. 3. Did the District Court err in admitting DNA evidence which came from a rape kit which a nurse sealed and then opened to double check her paperwork?**


**¶6. 4. Was the evidence sufficient to support Southern's convictions on Counts II**

**through VIII?**

## Procedural Background

¶7. On March 5, 1997, the State charged Southern by Amended Information with two counts of kidnaping, one count of burglary, one count of theft, and five counts of sexual intercourse without consent. The Amended Information alleged that, on four occasions from April 25, 1994, to June 10, 1996, Southern raped four older women in the Helena area. The Amended Information also alleged that Southern kidnaped two of the victims and burglarized and stole money from another victim.

¶8. On March 7, 1997, Southern filed a motion to sever the nine counts in the Amended Information pursuant to § 46-13-211, MCA, based on there being four different victims and claimed lack of similarity of the alleged crimes. Southern asserted that joinder of the counts for trial was not proper under § 46-11-404, MCA, and that he would be unfairly prejudiced if he was tried on all nine counts at one trial. On April 16, 1997, the District Court denied Southern's motion to sever.

¶9. Southern filed a motion *in limine* on March 14, 1997, to prohibit the State from introducing microscopic hair comparison evidence. Southern argued that microscopic hair comparison evidence was inadmissible under Rules 702 and 403, M.R.Evid. On April 10, 1997, the District Court denied Southern's motion *in limine*.

¶10. A jury trial was held April 28 through May 2, 1997. The jury found Southern guilty on all nine counts charged in the Amended Information.

¶11. On July 11, 1997, the District Court sentenced Southern to imprisonment at the Montana State Prison (MSP) for a term of one hundred years on each of four of the counts of sexual intercourse without consent; to twenty years at the MSP on the remaining count of sexual intercourse without consent; to ten years at the MSP on each count of kidnaping; to twenty years at the MSP for the count of burglary; and to six months at the Lewis and Clark County Jail for the count of theft. The court ordered that all sentences run consecutively and that Southern be ineligible for parole. Southern appeals his convictions. To the extent necessary, we will discuss the facts of Southern's crimes as part of our analysis of the issues.

## Issue 1.

No

¶12. *Did the District Court err in denying Southern's motion to sever the counts against him into four separate trials?*

¶13. The District Court ruled that Southern would not be prejudiced if tried on all nine counts together, and thus denied Southern's motion to sever the counts into four separate trials based on there being four different victims and claimed lack of similarity of the alleged crimes. Southern contends that the District Court erred in not considering whether the counts were properly joined in the Amended Information. Southern asserts that the counts were misjoined and, therefore, that the court erred in denying his motion to sever the counts in the Amended Information into four separate trials. In the alternative, Southern asserts that the court erred in denying his motion because severing the counts into four separate trials was necessary to prevent unfair prejudice. The State, however, maintains that the counts were properly joined and that Southern failed to prove that the prejudice was so great that it prevented a fair trial. We agree with the State.

¶14. A criminal defendant seeking to sever counts into separate trials has the burden of proving either that the counts were misjoined under § 46-11-404(1), MCA, or, if joinder was proper, that severing the counts under § 46-13-211(1), MCA, is necessary to prevent unfair prejudice. See *State v. Richards* (1995), 274 Mont. 180, 186, 906 P.2d 222, 226 (stating that, in issues regarding joinder and severance of criminal charges, this Court first determines whether joinder of the charges was proper and then determines whether severance of the charges was necessary to prevent prejudice to the defendant). See also *State v. Martin* (1996), 279 Mont. 185, 192, 926 P.2d 1380, 1384 (citing *State v. Slice* (1988), 231 Mont. 448, 451, 753 P.2d 1309, 1311) (stating that a criminal defendant moving for severance pursuant to § 46-13-211(1), MCA, has the burden of proving that the joinder of the charges is prejudicial).

A.

¶15. *Was joinder of the counts in the Amended Information proper pursuant to § 46-11-404(1), MCA?*

¶16. Southern argues that the counts of sexual intercourse without consent were misjoined in the Amended Information because they were not sufficiently similar to each other. Consequently, Southern contends that the District Court should have severed the counts and conducted four separate trials on the charges as to each

victim. The State, however, contends that the counts of sexual intercourse without consent were sufficiently similar to each other and, therefore, that they were properly joined in the Amended Information.

**¶17. Determining whether charges were properly joined in a charging document is a question of law which we review de novo. See *United States v. VonWillie* (9th Cir. 1995), 59 F.3d 922, 929 (citing *United States v. Vasquez-Velasco* (9th Cir. 1994), 15 F.3d 833, 843) (interpreting Rule 8(a), Fed.R.Crim.P.).**

**¶18. Section 46-11-404(1), MCA, provides in pertinent part:**

Two or more offenses . . . may be charged in the same charging document in a separate count, . . . if the offenses charged, whether felonies or misdemeanors or both, are *of the same or similar character* or are based on the same transactions connected together or constituting parts of a common scheme or plan.(Emphasis added.) Two or more offenses do not need to be identical to be joined in an information pursuant to this statute; rather, the offenses need only be sufficiently similar. Cf. *State v. Whitlow* (1997), 285 Mont. 430, 438, 949 P.2d 239, 244 (citing *State v. Weldy* (1995), 273 Mont. 68, 74, 902 P.2d 1, 5) (stating that under the Modified *Just* Rule, which governs the admissibility of other crimes, wrongs or acts in a criminal trial, that the other crimes, wrongs or acts need not be identical to the charged conduct to be admissible, only sufficiently similar).

**¶19. Although not determinative, some factors which are relevant to whether charges in an information are "of the same or similar character" are: (1) whether the charges are brought under the same statute; (2) whether the charges involve similar victims, locations, or modes of operation; (3) whether the charged conduct occurred in a narrow time frame; and (4) whether the charged conduct occurred in a limited geographical area. See *United States v. Edgar* (1st Cir. 1996), 82 F.3d 499, 503 (citing *United States v. Taylor* (1st Cir. 1995), 54 F.3d 967, 973) (interpreting Rule 8(a), Fed. R.Crim.P., which is substantively identical to § 46-11-404(1), MCA); *United States v. Acker* (4th Cir. 1995), 52 F.3d 509, 514 (citing *United States v. DeBordez* (8th Cir. 1984), 741 F.2d 182, cert. denied, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 707) (stating that, under Rule 8(a), Fed.R.Crim.P., offenses may be joined when they are "identical or strikingly similar in the method of operation and occur over a short period of time"); and *United States v. Chambers* (1st Cir. 1992), 964 F.2d 1250, 1251 (stating that the charged offenses were sufficiently similar for joinder under Rule 8 (a), Fed.R.Crim.P., in part, because they all occurred in the greater Boston area).**

¶20. In the instant case, Southern differentiates the counts of sexual intercourse without consent by pointing out that each victim was raped at a different hour of the day. Southern also differentiates the *modus operandi* of the counts of sexual intercourse without consent by pointing out that a knife was used on three of the victims but not on the remaining victim. Southern finally points out that, although three of the victims were raped in their home, one victim was kidnaped and raped at a location west of Helena and that one of the victims who was raped in her home was subsequently taken to a location west of Helena and raped a second time.

¶21. Despite these differences, the charges in the Amended Information were sufficiently similar to be joined in the Amended Information pursuant to § 46-11-404 (1), MCA. The State brought each charge of sexual intercourse without consent under § 45-5-503, MCA. The victims are all older women. They were raped in the same limited geographical area-- either in their homes in Helena, at a rural location west of Helena or both. The perpetrator covered each victim's face with an article of clothing and demanded money from each victim. Each victim was raped within a relatively narrow time frame--two and one-half years (April 25, 1994 to November 2, 1996). Finally, each victim described the perpetrator as a white male with short brown or dark hair. Thus, on the whole, the *modus operandi* and victims of the rapes were similar. We conclude that the five counts of sexual intercourse without consent were of the same or similar character and were therefore properly joined in the Amended Information pursuant to § 46-11-404(1), MCA.

¶22. Southern also maintains that the two counts of kidnaping are not of the same or similar character and, therefore, that they were misjoined. Along these same lines, Southern argues that the charges of burglary and theft were misjoined because they were not of the same or similar character to the other charges in the Amended Information.

¶23. However, counts may be joined in an information pursuant to § 46-11-404(1), MCA, not only if the offenses are of the same or similar character, but also if the offenses "constitut[e] parts of a common scheme or plan." A common scheme is a "series of acts or omissions motivated by a purpose to accomplish a single criminal objective or by a common purpose or plan that results in the repeated commission of the same offense or that affects the same person or the same persons or the property of the same person or persons." Section 45-2-101(7), MCA. Thus, joining two charges is proper in cases in which one charge precipitates the second charge and in cases in

which the charges are logically linked by motive and where overlapping proof must be offered. *Richards*, 274 Mont. at 187, 906 P.2d at 226 (citing *State v. Bingman* (1987), 229 Mont. 101, 109, 745 P.2d 342, 347 and *State v. Baker* (1989), 237 Mont. 140, 144, 773 P.2d 1194, 1197).

¶24. Here, Southern concedes in his brief that there would be overlapping proof regarding the kidnaping, burglary, and theft charges and the accompanying charges of sexual intercourse without consent. Thus, the counts of kidnaping, burglary, and theft were properly joined with the accompanying counts of sexual intercourse without consent in the Amended Information because overlapping proof would have been offered to prove the crimes. See *Richards*, 274 Mont. at 187, 906 P.2d at 226 (citation omitted). Moreover, even if Southern had not conceded this point, the kidnaping, burglary, and theft charges were properly joined in the Amended Information pursuant to § 46-11-404(1), MCA, because they were each part of a "series of acts . . . motivated by a purpose to accomplish a single criminal objective" and, therefore, parts of a common scheme. Section 45-2-101(7), MCA. Thus, the counts of kidnaping, burglary, and theft were properly joined with the accompanying charges of sexual intercourse without consent in the Amended Information pursuant to § 46-11-404(1), MCA.

¶25. In sum, the five counts of sexual intercourse without consent were properly joined in the Amended Information pursuant to § 46-11-404(1), MCA, because they were of the same or similar character. The two counts of kidnaping, count of burglary, and count of theft were properly joined in the Amended Information pursuant to § 46-11-404(1), MCA, because they were part of a common scheme and because overlapping proof would have been required regarding these charges and the accompanying charges of sexual intercourse without consent. Accordingly, even though the District Court did not directly address this issue, we hold that all nine counts in the Amended Information were properly joined.

## B.

¶26. *Was severing the counts necessary to prevent unfair prejudice to Southern?*

¶27. Southern argues that severing the counts by victim (resulting in four separate trials) was necessary to prevent unfair prejudice. The State, in contrast, argues that Southern did not meet his burden of proving that the prejudice was so great that he

**was denied a fair trial.**

**¶28. Section 46-13-211(1), MCA, provides in pertinent part:**

If it appears that a defendant . . . is prejudiced by a joinder of charges . . . in an . . . information, . . . the court may order separate trials, . . . or provide whatever other relief justice requires. This statute requires trial courts to balance the possibility of prejudice to a criminal defendant against the judicial economy resulting from a joint trial. *Martin*, 279 Mont. at 191, 926 P.2d at 1384 (citing *Richards*, 274 Mont. at 188, 906 P.2d 222, 226-27). This balancing is within the trial court's discretion; thus, we will not substitute our judgment for that of the trial court unless the trial court abused its discretion. *Martin*, 279 Mont. at 191, 926 P.2d at 1384 (citing *Richards*, 906 P.2d at 227).

**¶29. It is not sufficient for a criminal defendant to prove that he will face some prejudice as a result of a joint trial or that he stands a better chance of acquittal if separate trials are held. *Martin*, 279 Mont. at 192, 926 P.2d at 1384 (citing *Richards*, 906 P.2d at 227). Rather, a criminal defendant must prove that the prejudice is so great as to prevent a fair trial. *Martin*, 279 Mont. at 192, 926 P.2d at 1384-85 (citing *Richards*, 906 P.2d at 227).**

**¶30. Three types of prejudice may result from consolidating charges. *Martin*, 279 Mont. at 192, 926 P.2d at 1385 (citing *Richards*, 906 P.2d at 227). First, a jury may consider the criminal defendant facing multiple charges a "bad man" and accumulate evidence until it finds the defendant guilty of something. Second, a jury may use proof of guilt on one count to convict the defendant of a second count even though that proof would be inadmissible at a separate trial on the second count. Third, the defendant may be prejudiced if he or she wishes to testify on one charge but not on another. *Martin*, 279 Mont. at 192, 926 P.2d at 1385 (citing *Richards*, 906 P.2d at 227). See also *State v. Orsborn* (1976), 170 Mont. 480, 489, 555 P.2d 509, 514-15 (citations omitted).**

*1. Accumulation of Evidence*

**¶31. Southern argues that the DNA evidence on one count of sexual intercourse without consent (Count IX), which showed that DNA from one victim's vaginal swab matched Southern's genetic profile to a high degree of certainty, caused the jury to decide that he was a bad person and, consequently, to convict him of the other counts**

even though there was no DNA match on those counts.

**¶32. Whatever the cumulative effect of this evidence was on the multiple charges, however, we conclude that it was tenuous, at best, and, by itself, insufficient to warrant severance. See _Martin_, 279 Mont. at 192, 926 P.2d at 1385. Moreover, as is discussed in greater detail in Issue 4, there was sufficient evidence for a rational jury to find that Southern committed each offense charged in the Amended Information. Consequently, we hold that the prejudice which arose from the cumulative evidence at Southern's trial was not so great that it prevented a fair trial.**

### 2. _Use of Inadmissible Evidence_

**¶33. Southern claims that he was unfairly prejudiced because the joint trial caused the jury to use evidence of guilt on some counts to convict him of other counts even though the evidence which the jury considered would have been inadmissible at a separate trial on the other counts. More specifically, Southern argues that the evidence relating to each victim would have been inadmissible at trials relating to the other victims under Rule 404(b), M.R.Evid., and our decision in _State v. Matt_ (1991), 249 Mont. 136, 814 P.2d 52. The State, however, asserts that, even if there had been four trials, the evidence of the crimes committed against the other victims would have been admissible in each trial.**

**¶34. In _Matt_, we modified the requirements for admitting evidence of other crimes, wrongs or acts that we had set out in _State v. Just_ (1979), 184 Mont. 262, 602 P.2d 957. Based on Rules 403 and 404(b), M.R.Evid., we established the following criteria to determine the admissibility of other crimes, wrongs or acts:**

(1) The other crimes, wrongs or acts must be similar;

(2) The other crimes, wrongs or acts must not be too remote in time;

(3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that they acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident;

(4) Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Matt*, 249 Mont. at 142, 814 P.2d at 56. These criteria have come to be known as the Modified Just Rule.[1]

¶35. Southern concedes that the evidence of the other crimes was not too remote in time to be admissible and that it was admissible under the third part of the Modified *Just* Rule. Nevertheless, Southern asserts that the evidence of the other crimes would have been inadmissible at separate trials because the other crimes were not similar and because the danger of unfair prejudice substantially outweighed the probative value of the other crimes evidence. We will address these issues in turn.

¶36. Southern first argues that the other crimes were not similar and, therefore, that the evidence of other crimes would not have been admissible at separate trials. However, as we stated in Issue I. A., although the crimes against each victim were not identical, they were sufficiently similar to be joined in the Amended Information pursuant to § 46-11-404(1), MCA. Likewise, and for the same reasons which we outlined in Issue I. A., the four incidents at issue in the instant case are sufficiently similar to satisfy the first part of the Modified *Just* Rule, and thus would have been admissible at separate trials on this basis.

¶37. Southern next argues that the prejudicial effect of the other crimes evidence substantially outweighed its probative value. Therefore, Southern claims that the evidence of other crimes would not have been admissible in separate trials.

¶38. It is inevitable that evidence of other crimes, wrongs or acts will have some prejudicial effect on a criminal defendant. *State v. Whitlow* (1997), 285 Mont. 430, 439, 949 P.2d 239, 245 (citing *State v. Brooks* (1993), 857 P.2d 734, 737). Consequently, relevant evidence will be inadmissible under the fourth part of the Modified *Just* Rule only when "its probity is *substantially* outweighed by the danger of unfair *prejudice*." *Martin*, 279 Mont. at 195-96, 926 P.2d at 1387 (citing *Matt*, 814 P.2d at 56).

¶39. The prejudicial effect of relevant evidence will substantially outweigh the probative value of the evidence when the evidence will prompt the jury to decide the case on an improper basis. *State v. Heuther* (1997), 284 Mont. 259, 265, 943 P.2d

1291, 1295 (citation omitted). Thus, evidence is inadmissable under the fourth part of the Modified *Just* Rule if it arouses the jury's sympathy for one side without regard to its probative value, if it confuses or misleads the jury, or if it distracts the jury from the main issues in the case. *Huether*, 284 Mont. at 265, 943 P.2d at 1295 (citation omitted).

¶40. In the instant case, although the evidence of the other crimes would have been prejudicial to Southern, it was not the type of evidence which would arouse the jury's sympathy nor would it have confused, misled, or distracted the jury from the main issues in the case. Thus, we hold that its probative value was not substantially outweighed by the danger of unfair prejudice.

¶41. Moreover, prejudice arising from use of inadmissible evidence will not be found where the evidence is simple and distinct. *Martin*, 279 Mont. at 193, 926 P.2d at 1385 (citing *Richards*, 906 P.2d at 227). The policy underlying this rule is that there is no reason to assume the jury will be confused and cannot keep the relevant evidence separate when the charges are few and the evidence straight forward. *Martin*, 279 Mont. at 193, 926 P.2d at 1385 (citing *State v. Campbell* (1980), 615 P.2d 190, 199).

¶42. Here, although the State charged Southern with nine counts, the evidence pertaining to each count was simple, distinct and straight forward. There were four discrete victims, specific crimes committed against each victim, and the evidence clearly applied only to the specific crimes committed against each victim. Thus, after reviewing the record, we conclude that there is nothing that suggests that the jury could not (and did not) keep the relevant evidence separate. Moreover, the District Court instructed the jury that each charged count was a distinct offense and that the jury was to decide each count separately. Consequently, since the evidence of the other crimes, wrongs or acts would have been admissible at separate trials and since the evidence was simple and distinct, we hold that Southern did not establish that the jury used evidence of guilt on one charge to convict him of other charges on his theory that the evidence would have been inadmissible in the trials on the other charges.

## 3. Self-Incrimination

¶43. Since Southern testified on all counts at the trial on this matter, he concedes that he was not unfairly prejudiced in this regard. Accordingly, we will not address this

type of prejudice.

¶44. In sum, even though Southern may have faced some prejudice as a result of the joint trial, he did not prove that the prejudice was so great that it prevented a fair trial. Accordingly, we affirm the District Court's order denying Southern's motion to sever the counts into four trials pursuant to § 46-13-211(1), MCA.

## Issue 2.

¶45. *Did the District Court err in denying Southern's motion* in limine *to preclude the State from offering microscopic hair comparison evidence at trial?*

¶46. Before the trial, Southern filed a motion *in limine* to exclude the testimony of Alice Ammen (Ammen), a forensic scientist at the Montana State Crime Lab. Ammen testified at the trial that she microscopically compared Southern's hair sample to hairs from the rape scenes and that the hair from the rape scenes was either "similar to" or "consistent with" Southern's hair sample. Southern contends that Ammen's testimony was inadmissible under Rule 702, M.R.Evid., because it did not satisfy the factors for the reliability of expert testimony which the United States Supreme Court set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and which this Court adopted in *State v. Moore* (1994), 268 Mont. 20, 885 P.2d 457. In support of his argument, Southern cites *Williamson v. Reynolds* (E.D.Okl. 1995), 904 F.Supp. 1529 and *McGrew v. State* (Ind. App. 1996), 673 N.E.2d 787, wherein the courts ruled that microscopic hair comparison testimony was inadmissible under *Daubert* because it was unreliable.

¶47. The State responds that, in Montana, the *Daubert* factors only apply to the admissibility of novel scientific evidence and, since microscopic hair comparison is not novel scientific evidence, that Southern's reliance on the *Daubert* factors is misplaced. Thus, the State concludes that Ammen's testimony was admissible under Rule 702, M.R.Evid.

¶48. The admissibility of evidence is left to the discretion of the district court judge. *State v. Lancione*, 1998 MT 84, ¶ 20, 288 Mont. 228, ¶ 20, 956 P.2d 1358, ¶ 20 (citing *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263). Thus, this Court reviews a district court's evidentiary ruling, including a court's ruling on a motion *in*

*limine*, to determine whether the court abused its discretion. *Lancione*, ¶ 20 (citing *Gollehon*, 262 Mont. at 301, 864 P.2d at 1263). See also *Hulse v. State, Dept. of Justice,* 1998 MT 108, ¶ 15, 289 Mont. 1, ¶ 15, 961 P.2d 75, ¶ 15 (holding that this Court reviews a district court's ruling on a motion *in limine* for abuse of discretion). Montana's district courts are "vested with *great* latitude in ruling on the admissibility of expert testimony." *Durbin v. Ross* (1996), 276 Mont. 463, 477, 916 P.2d 758, 767 (citing *Cottrell v. Burlington Northern R. Co.* (1993), 261 Mont. 296, 301, 863 P.2d 381, 384 and *Jim's Excavating Service v. HKM Assoc.* (1994), 265 Mont. 494, 509, 878 P.2d 248, 257).

¶49. Rule 702, M.R.Evid., which is identical to its federal counterpart, governs the admissibility of expert testimony and provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. We have stated that "[t]he test for admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue." *Hulse*, ¶ 48 (quoting *Durbin*, 276 Mont. at 469, 916 P.2d at 762). See also *Durbin*, 276 Mont. at 477, 916 P.2d at 767 (citing *Newville v. State, Dept. of Family Services* (1994), 267 Mont. 237, 257, 883 P.2d 793, 805) (stating that "[e]xpert testimony is required in areas not within the range of ordinary training or intelligence."). Hence, in determining whether expert testimony is admissible under Rule 702, M.R.Evid., the trial court must initially decide whether the subject matter of the testimony is one that requires expert testimony. See *Durbin*, 276 Mont. at 477, 916 P.2d at 767. The trial court must then decide whether the particular witness is qualified as an expert to give an opinion in the particular area on which he or she proposes to testify. See *Durbin*, 276 Mont. at 477, 916 P.2d at 767. Thus, Rule 702, M.R.Evid., "implicitly requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion." *Durbin*, 276 Mont. at 477-78, 916 P.2d at 767 (quoting *Cottrell,* 863 P.2d 381 at 384).

¶50. In *Barmeyer v. Montana Power Co.* (1983), 202 Mont. 185, 657 P.2d 594, this Court noted that before Rule 702, M.R.Evid., was adopted, courts required a foundation showing that the proffered expert testimony involved a field of science which had gained "general acceptance" by the relevant scientific community.

*Barmeyer*, 202 Mont. at 193, 657 P.2d at 598 (citing *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013). However, this Court pointed out that there was a trend to liberalize the admission of expert testimony, that the general acceptance test had been eroded, and that neither Rule 702, M.R.Evid., nor the Commission Comments to the rule mentioned the general acceptance test. *Barmeyer*, 202 Mont. at 193, 657 P.2d at 598 (citation omitted). Therefore, this Court held that the general acceptance test was not "in conformity with the spirit of the new rules of evidence." *Barmeyer*, 202 Mont. at 193, 657 P.2d at 598. This Court then explained that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Barmeyer,* 202 Mont. at 193-94, 657 P.2d at 598 (quoting *United States v. Baller* (4th Cir. 1975), 519 F.2d 463, 466, cert. denied 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391).

¶51. In *Daubert*, the United States Supreme Court considered the standard for admitting expert scientific testimony in a federal trial. The Court ruled that the general acceptance test was absent from, and incompatible with, the Federal Rules of Evidence. *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794. Therefore, the Court held that the general acceptance test was not the exclusive test for admitting expert scientific testimony in a federal trial. *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794. Instead, the Supreme Court concluded that Rule 702, Fed.R.Evid., requires a trial court which is faced with a proffer of expert scientific testimony to determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist that trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. The Court also noted that Rule 702, Fed.R.Evid., requires trial courts to act as a gatekeeper and screen potential expert scientific testimony to ensure that it is relevant to the case and reliable. *Daubert*, 509 U.S. at 589-91, 113 S.Ct. at 2795.

¶52. The Court set forth the following non-determinative factors to guide trial courts assessing the reliability of proffered scientific expert testimony: (a) whether the theory or technique can be and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) whether the theory or technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (d) whether the theory or technique has been generally accepted or rejected in the particular scientific field. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2796-97.

¶53. The Court recently expanded *Daubert's* general holding by concluding that the

trial court's gatekeeping obligation under Rule 702, Fed.L.Evid., applies not only to testimony based on scientific knowledge but also to testimony based on technical and other specialized knowledge. *Kumho Tire Co. v. Carmichael* (1999), ___ U.S. ___, ___, 119 S.Ct. 1167, 1175. The Court also concluded that the trial court may consider one or more of the factors that *Daubert* outlined for assessing testimony's reliability. *Kumbo Tire*, ___ U.S. at ___, 119 S.Ct. at 1175. Even so, the Court emphasized that the test of reliability is flexible and that *Daubert's* factors neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire*, ___ U.S. at ___, 119 S. Ct. at 1175.

¶54. In 1994, this Court adopted the factors for determining the reliability of expert scientific testimony that the Supreme Court set forth in *Daubert* and stated that they are consistent with our holding in *Barmeyer* concerning the admission of novel scientific evidence. *State v. Moore* (1994), 268 Mont. 20, 42, 885 P.2d 457, 470-71. In *Moore*, the defendant argued that the district court erred in admitting DNA evidence. Although the foundation of the testimony of the State's expert witnesses was somewhat shaky, we concluded that the district court did not err in ruling that the defendant's objections to the DNA evidence went to the weight of the evidence and not to the admissibility of the evidence. *Moore*, 268 Mont. at 42-43, 885 P.2d at 471.

¶55. Two years later, in *State v. Cline* (1996), 275 Mont. 46, 909 P.2d 1171, the defendant argued that the district court erred in allowing a FBI fingerprint technician to testify as to the age of the defendant's fingerprint which was found on an envelope. We pointed out that fingerprint evidence is not novel scientific evidence but that the issue before us was whether it was possible to determine the age of a fingerprint using magnetic powder. *Cline*, 275 Mont. at 55, 909 P.2d at 1177. Because we considered the fingerprint aging techniques at issue to be novel scientific evidence, we applied the *Daubert* factors to determine whether the technique was reliable. *Cline*, 275 Mont. at 56, 909 P.2d at 1178. Even so, we stated that it is certain that "all scientific expert testimony in not subject to the *Daubert* standard and the *Daubert* test should only be used to determine the admissibility of novel scientific evidence." *Cline*, 275 Mont. at 55, 909 P.2d at 1177.

¶56. Thereafter, in *Hulse*, the petitioner, who appealed from a district court's decision not to reinstate her driving privileges after they were suspended for failing to take an alcohol breath test, argued that the results of a Horizontal Gaze Nystagmus (HGN) test was inadmissible. The petitioner argued that the HGN test is

**a scientific test and that the results of a HGN test are therefore inadmissible unless the requirements of *Daubert* are met. She argued that *Daubert* was not limited to the admissibility of "novel" scientific evidence and that *Barmeyer* and *Daubert* were inconsistent. We disagreed and reaffirmed our holding in *Cline* that the *Daubert* factors for determining the reliability of expert scientific testimony should be used only to determine the admissibility of novel scientific evidence. *Hulse*, ¶ 56 (quoting *Cline*, 275 Mont. at 55, 909 P.2d at 1177). Moreover, we held that *Barmeyer* should not be limited only to novel scientific evidence. "Rather, our statements in *Barmeyer* more broadly referenced the entire trend to liberalize the admission of expert testimony as it applied to scientific evidence in general." *Hulse*, ¶ 61. Thus, we summarized the law concerning the admissibility of scientific expert testimony in Montana by stating that**

a trial court, presented with scientific evidence, novel or not, is encouraged to liberally construe the rules of evidence so as to admit all relevant expert testimony pursuant to *Barmeyer*. Certainly, if a court is presented with an issue concerning the admissibility of novel scientific evidence, as was the case in both *Moore* and *Cline*, the court must apply the guidelines set forth in *Daubert*, while adhering to the principle set forth in *Barmeyer*. However, if a court is presented with an issue concerning the admissibility of scientific evidence in general, the court must employ a conventional analysis under Rule 702, M.R. Evid., while again adhering to the principle set forth in *Barmeyer*.

*Hulse, ¶ 63.*

**¶57. We then turned to the issue of whether the HGN test is novel scientific evidence. We noted that law enforcement has used the HGN test for several decades and that other courts throughout the country had determined that the HGN test was not an emerging, new, or novel scientific technique. *Hulse*, ¶ 68 (citations omitted). Consequently, we concluded that the HGN test is not novel scientific evidence and, therefore, that a district court did not need to apply the *Daubert* standards to determine whether the HGN test was admissible under Rule 702, M.R.Evid. *Hulse*, ¶ 69.**

**¶58. Even so, since the relationship between alcohol and nystagmus, and the underlying principle of the HGN test is beyond the range of ordinary training or intelligence, we held that a district court must conduct a conventional Rule 702, M.R.**

Evid. analysis to determine the admissibility of HGN test results while adhering to the principle set out in *Barmeyer*. *Hulse* ¶ 69. Since the record showed that a foundation was laid which showed that the arresting officer was trained to administer the HGN test and that the officer administered the HGN test in accordance with his training, we held that the officer was qualified to testify as to both his administration of the HGN test and his evaluation of the petitioner's performance. *Hulse*, ¶ 72. Notwithstanding, nothing in the record established that the officer had either special training, education, or adequate knowledge which qualified him as an expert to explain the correlation between alcohol consumption and nystagmus, the underlying scientific basis of the HGN test. *Hulse*, ¶ 72. Thus, we concluded that there was insufficient foundation for the admission of evidence concerning the HGN test. *Hulse*, ¶ 72.

¶59. In the instant case, we conclude that microscopic hair comparison is not novel scientific evidence. Our research indicates that this Court has considered at least five cases since 1978 wherein a witness has testified on microscopic hair comparison.[2] Moreover, Ammen testified that comparing hair samples with a microscope "has been [done] for decades." Therefore, since microscopic hair comparison is not novel scientific evidence, the District Court did not err in not considering the *Daubert* factors to determine whether Ammen's testimony was admissible. See *Hulse*, ¶ 69.

¶60. Nevertheless, a district court faced with a proffer of microscopic hair comparison evidence must conduct a conventional Rule 702, M.R.Evid. analysis, and thus adhere to the principle set out in *Barmeyer*, to determine whether the microscopic hair comparison evidence is admissible. See *Hulse*, ¶ 69. That is, a district court must determine: (1) whether the subject matter of the testimony is one that requires expert testimony and (2) whether the putative expert has either special training or education and has adequate knowledge on which to base an opinion. See *Durbin*, 276 Mont. at 477, 916 P.2d at 767.

¶61. In the case at bar, we hold that microscopic hair comparison, like the HGN test, is beyond the range of ordinary training or intelligence. Consequently, microscopic hair comparison evidence is a subject on which an expert may testify. See *Hulse*, ¶ 69.

¶62. Having reviewed the record, we also hold that the State established a foundation which showed that Ammen was qualified to testify on microscopic hair comparison

and that she had adequate knowledge on which to base an opinion. Ammen testified at the trial that she had been working with trace evidence (such as hair, fibers, glass, and paint) for four and one-half years at the Montana State Crime Lab. She stated that she spends about ninety per cent of her time examining trace evidence. Ammen also testified that she had taken several training courses at the FBI Academy that dealt with trace evidence and that she had taken several other courses on forensic microscopy. Ammen testified that she is a member of two forensic scientist groups and that she is involved with writing guidelines for trace evidence examination for one of the groups. Ammen also stated that she had testified in other cases regarding her examinations of trace evidence and that she had been recognized as an expert witness in those cases. Ammen also explained how she analyzes hair samples. Finally, she stated that she had examined hair samples from the crimes scenes at issue in the instant case, from the victims, and from Southern. Accordingly, we conclude that this foundation shows that Ammen has special training and education concerning microscopic hair analysis and that she had adequate knowledge on which to base an opinion in the instant case.

¶63. In sum, since microscopic hair analysis is not novel scientific evidence, the District Court did not err in not applying the *Daubert* factors to determine whether such analysis was reliable. However, since microscopic hair analysis is a subject which requires expert testimony and since Ammen has special training and education and had adequate knowledge on which to base her opinions, the District Court did not err in admitting Ammen's expert testimony regarding microscopic hair comparison under Rule 702, M.R.Evid. Accord *United States v. Matta-Ballesteros* (9th Cir. 1995), 71 F.3d 754, 766-67 (holding that the defendant's objection to expert microscopic hair comparison testimony went to the weight, not the admissibility, of the testimony, and therefore that Rule 702, Fed.R.Evid., did not warrant the exclusion of such testimony).

¶64. As a final point, the two cases which Southern relies on for the proposition that microscopic hair comparison evidence is inadmissible under the *Daubert* factors have been specifically reversed or overruled on that point. *Williamson*, 904 F.Supp. 1529 (reversed in part by *Williamson v. Ward* (10th Cir. 1997), 110 F.3d 1508, 1522-23) and *McGrew,* 673 N.E.2d 787 (overruled in part by *McGrew v. State* (Ind. 1997), 682 N. E.2d 1289, 1292). Consequently, those cases are not persuasive authority.

¶65. Southern also contends that Ammen's testimony was inadmissible under Rule

403, M.R.Evid., because its prejudicial effect substantially outweighed its probative value. Southern maintains that hair comparison evidence is unfairly prejudicial because it is not possible to determine whether hair comes from a particular person. Thus, he concludes that the jury may have been misled because the microscopic hair comparison evidence did not positively identify him. The State counters Southern's argument that Ammen's testimony was inadmissible under Rule 403, M.R.Evid., by arguing that positive identification is not the standard for admissibility of circumstantial evidence.

¶66. Rule 403, M.R.Evid., provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." Probative evidence is often, if not always, prejudicial to a criminal defendant. See *Martin*, 279 Mont. at 196, 926 P.2d at 1387. Consequently, mere prejudicial effect does not render evidence inadmissible; relevant evidence is inadmissible under Rule 403, M.R.Evid., only when its probative value is substantially outweighed by its unfair prejudicial effect.

¶67. As we noted in Issue I. B., the prejudicial effect of relevant evidence will substantially outweigh the probative value of the evidence when the evidence will prompt the jury to decide the case on an improper basis (such as sympathy) or will confuse, mislead or distract the jury from the main issue in the case. *Huether*, 284 Mont. at 265, 943 P.2d at 1295 (citation omitted).

¶68. In the instant case, the District Court did not directly address Southern's argument under Rule 403, M.R.Evid. However, after reviewing the record, we conclude that the court did not err in admitting Ammen's testimony based on Rule 403 concerns. Ammen's testimony was probative because it linked Southern to the crime scenes and suggested his involvement in the crimes. See *State v. Lantis*, 1998 MT 172, ¶ 54, 289 Mont. 480, ¶ 54, 962 P.2d 1169, ¶ 54. Although Ammen's testimony was undoubtedly prejudicial to Southern, it could not have prompted the jury to decide the case on an improper basis. Moreover, Ammen clearly explained, in both direct and cross-examination, that she could not say that the hair from the rape scenes came from Southern; she could only say that the hairs from the crime scenes were either "similar to" or "consistent with" Southern's hair sample. Thus, Ammen's testimony could not have misled or confused the jury nor could it have distracted the jury from the main issues in the case. Accordingly, after balancing the probative value of Ammen's testimony against the danger of unfair prejudice,

confusion of the issues, and misleading the jury, we hold that the admission of this evidence did not violate Rule 403, M.R.Evid.

## Issue 3.

¶69. *Did the District Court err in admitting DNA evidence which came from a rape kit which a nurse sealed and then opened to double check her paperwork?*

¶70. Jan Yahner (Yahner), a nurse who collected the samples from one of the victims for a rape kit, testified at the trial that she placed the samples inside the rape kit and then sealed the kit. However, Yahner testified that she then broke the seal to double check that she had placed the proper paperwork in the rape kit. The seal on the rape kit apparently stated that only the crime lab was to break the seal. Consequently, Southern objected to the admission of evidence from the rape kit "just for the simple reason that the proper procedures were not followed in this case by [Yahner] opening the box." The District Court overruled Southern's objection.

¶71. Southern asserts on appeal that the District Court erred in admitting the DNA evidence which came from the rape kit because Yahner tampered with the rape kit after she sealed it for the first time. The State argues that there was no evidence which shows that Yahner tampered with the samples which she placed inside the rape kit when she broke the seals to check her paperwork. As such, the State argues that the rape kit evidence was admissible.

¶72. A criminal defendant seeking to exclude evidence on the grounds that the evidence was tampered with before the prosecution acquired the evidence has the burden of proving that someone altered the evidence. See *State v. Evans* (1991), 247 Mont. 218, 228, 806 P.2d 512, 518 (citing *State v. Walton* (1986), 222 Mont. 340, 343, 722 P.2d 1145, 1147). See also § 45-2-101(72), MCA (stating that "[t]amper means to interfere with something improperly, meddle with it, [or] make unwarranted alterations in its existing condition. . . .").

¶73. In the instant case, Yahner testified that she made no changes to the samples which she had placed inside the rape kit when she opened the kit to double check her paperwork. Southern, however, points to the testimony of Julie Long (Long), a forensic scientist at the Montana State Crime Lab, who agreed that opening a rape

kit could affect the integrity of the samples inside the kit.

¶74. Notwithstanding, Long also testified that the integrity of the samples would be unaffected if the rape kit was opened only to check the paperwork inside the kit. Long explained that the integrity of the samples inside the rape kit would be affected only if the person who opened the kit "did something with the samples." Long further explained that, "[j]ust opening the box to put papers in would, in and of itself, not affect the samples themselves which are inside [the rape kit] and inside other boxes inside [the rape kit]." Southern did not introduce any evidence which suggests that Yahner, or anyone else, tampered with the samples inside the rape kit. Since Southern did not prove that anyone had tampered with the samples inside the rape kit, the District Court did not err in admitting the evidence which came from the samples inside the rape kit, including the DNA evidence.

Issue 4.

¶75. *Was the evidence sufficient to support Southern's convictions on Counts II through VIII?*

¶76. Southern asserts that there was not sufficient evidence for the jury to find him guilty on Counts II through VIII. Southern maintains that DNA evidence exonerates him of one of the counts of sexual intercourse without consent (Count II); that DNA evidence and fingerprint evidence exonerates him of two other counts of sexual intercourse without consent and one count of kidnaping (Counts III, IV and V, respectively); and that, although the evidence when viewed in a light most favorable to the prosecution places Southern at the crime scenes of the burglary count, of a count of sexual intercourse without consent, and of a theft count (Counts VI, VII and VIII, respectively), mere presence at a crime scene is insufficient to find him guilty of these crimes and that the evidence was too speculative for the jury to convict him of these crimes.

¶77. The State maintains that neither the DNA evidence nor the fingerprint evidence excluded Southern as the perpetrator of any of the crimes. The State also maintains that even though more than presence at a crime scene is necessary to establish criminal liability, the evidence places Southern with the victim at the time when the victim was raped and that the only two people at the crime scene at that time was the

victim and her attacker. Thus, the State asserts that there was sufficient evidence for the jury to convict Southern on Counts II through VIII.

¶78. This Court reviews the sufficiency of the evidence to sustain a guilty verdict in a criminal case to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Johnson*, 1998 MT 289, ¶ 41, 969 P.2d 925, ¶ 41, 55 St.Rep. 1186, ¶ 41(citing *State v. Sattler*, 1998 MT 57, ¶ 56, 956 P.2d 54, ¶ 56, 55 St.Rep. 230, ¶ 56). "It is within the province of the finder of fact to weigh the evidence presented and determine the credibility of the witness; in the event of conflicting evidence on factual issues, the trier of fact determines which will prevail." *Johnson*, ¶ 41 (quoting *Sattler*, ¶ 55). Thus, "[w]e review the jury's verdict only to determine whether it is supported by sufficient evidence, not to determine whether there was evidence to support a different verdict." *Johnson*, ¶ 41 (quoting *Sattler*, ¶ 60).

## A

*Sufficiency of the Evidence on Count II*

¶79. Although Southern admits that the evidence, when viewed in a light most favorable to the State, is sufficient to sustain a guilty verdict on the charge of kidnaping (Count I) which occurred on November 2, 1996, he argues that the evidence was insufficient to sustain his conviction for sexual intercourse without consent against that victim (Count II) because the only evidence that supports the conviction was the victim's testimony. In addition, Southern argues that, since this victim's vaginal swabs contained only female DNA, the victim's credibility as to whether she was raped is suspect. Moreover, Southern claims that Anita Matthews (Matthews), a DNA expert, and Jim Streeter (Streeter), a forensic scientist at the Montana State Crime Lab, testified that the DNA from this victim excluded Southern as a the perpetrator.

¶80. The testimony of one witness is sufficient to establish a fact. Section 26-1-301, MCA. See also *State v. Ahmed* (1996), 278 Mont. 200, 212, 924 P.2d 679, 686, cert. denied (1997), ___ U.S. ___, 117 S.Ct. 748, 136 L.Ed.2d 686 (citation omitted). Thus, despite Southern's argument, the victim's testimony was sufficient to establish that Southern raped her. Moreover, the record shows that there was other corroborating

evidence, such as Southern's footprints at the crime scene, that, when viewed in a light most favorable to the prosecution, could have led a rational trier of fact to find Southern guilty beyond a reasonable doubt.

¶81. In addition, the record shows that neither Matthews nor Streeter testified that the DNA evidence from this victim's vaginal swab excluded Southern as the perpetrator. Rather, Matthews testified that the DNA which her company tested was consistent with the victim's DNA. Matthew's went on to explain that this result did not mean that no sexual intercourse occurred; it only meant that there was no cellular material foreign to the victim on the vaginal swab that was submitted for testing. Matthew's explained that, if sexual intercourse occurred, the assailant either left no cellular material or that it was left in an area other than the area from which the vaginal swab was taken. Thus, contrary to Southern's claim, Matthews did not testify that the DNA evidence from this victim excluded Southern as the assailant. Similarly, even though Streeter testified that Southern could be excluded as the source of the DNA which was tested, Streeter did not say that Southern could be excluded as the assailant. Therefore, the results of the DNA tests did not exclude Southern as the assailant. These results only determined that Southern was not the source of the DNA which was tested. Finally, even if the DNA evidence had brought this victim's credibility into issue, it is the fact finder, in the instant case the jury, which determines a witness' credibility; this Court will not set aside a jury's credibility determinations on appeal. *Ahmed*, 278 Mont. at 212, 924 P.2d at 686 (citations omitted).

¶82. In sum, having reviewed the record, we hold that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Southern committed the offense of sexual intercourse without consent as charged in Count II.

### B

*Sufficiency of the Evidence on Counts III, IV and V*

¶83. Southern next argues that there was insufficient evidence to convict him of the one count of kidnaping, and the two counts of sexual intercourse without consent (Counts III, IV and V, respectively), which occurred on June 10, 1996. Southern contends that DNA evidence and fingerprint evidence excludes him as the assailant. Southern also points out some inconsistencies in this victim's testimony and thus, in

effect, attacks her credibility. Southern also contends that, although footprints link him to the crime scene, this evidence was insufficient to convict him on Counts III, IV and V because mere presence at the scene of a crime does not establish guilt.

¶84. The victim of the offenses charged in Counts III, IV and V testified that, after her assailant raped her the first time in her house, he blindfolded her, tied her hands behind her back, placed her in a car, drove her to her bank and attempted to cash some checks which were in her checkbook. Deborah Hewitt (Hewitt), a forensic scientist at the Montana State Crime Lab, testified that she found a latent finger print on a plastic insert which was inside the victim's checkbook. Nevertheless, Hewitt testified that the print did not match either the victim or Southern. Southern points this out and, in effect, argues that the fingerprint exonerates him as the assailant. Notwithstanding, Hewitt explained that this result did not exonerate Southern as the assailant; it only meant that the print that she found was not Southern's print. Thus, the fingerprint on the checkbook insert did not exonerate Southern.

¶85. The victim of the offenses charged in Counts III, IV and V also testified that the assailant raped her the first time on a comforter which was on her bed. Matthews, however, testified that the DNA testing showed that Southern could be excluded as the contributor of a semen stain which was found on the comforter. Similarly, Streeter testified that the DNA tests showed that Southern could be excluded as the person who left the semen stain on the comforter. Southern asserts that this evidence exonerates him as this victim's assailant.

¶86. However, although the DNA testing showed that Southern did not leave the semen stain on the comforter, neither Matthews nor Streeter testified that the DNA results excluded Southern as the assailant. Rather, Matthews and Streeter stated that it was only possible to exclude Southern as the person who left the semen sample on the comforter. In sum, despite Southern's argument, neither Matthews nor Streeter's testimony excluded him as the assailant.

¶87. Moreover, Matthews testified that the DNA from the semen stain was consistent with the victim's DNA profile and that it was possible that it could have come from one of the victim's sons. Matthews also stated that the stain could have been left on the comforter years prior to the attack. In addition, the victim testified that her grown and married children had stayed in the bedroom when they had come to

Helena to visit her. Furthermore, the victim's testimony was consistent with the conclusion that the stain on the comforter did not come from the assailant. In fact, the victim testified that her assailant had difficulty maintaining an erection and did not ejaculate. Thus, this evidence supports the State's hypothesis that the semen stain was left by one of the victim's sons.

¶88. Next, although we agree with Southern that presence at a crime scene is insufficient, by itself, to prove criminal liability, see *State v. Johnston* (1994), 267 Mont. 474, 481, 885 P.2d 402, 406 (citing *State ex rel. Murphy v. McKinnon* (1976), 171 Mont. 120, 125, 556 P.2d 906, 909), the evidence in the instant case not only placed Southern at the crime scene but also established that he was the assailant when viewed in a light most favorable to the prosecution. Consequently, we reject Southern's argument that the evidence only placed him at the crime scene.

¶89. Finally, as we stated above, this Court will not set aside a jury's credibility determinations on appeal. *Ahmed*, 278 Mont. at 212, 924 P.2d at 686 (citations omitted). Thus, we will not address Southern's argument concerning this victim's credibility.

¶90. In sum, having reviewed the record, we hold that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Southern committed the offenses of kidnaping and sexual intercourse without consent as charged in Counts III, VI and V.

## C

*Sufficiency of the Evidence on Counts VI, VII and VIII*

¶91. Southern contends that there was not sufficient evidence to support his convictions for the count of burglary, the count of sexual intercourse without consent, and the count of theft (Counts VI, VII and VIII, respectively), which occurred on May 18, 1996. Southern maintains that the only evidence that connects him to these crimes is circumstantial, and that, although the circumstantial evidence places him at the crime scene, it does not establish that he committed the crimes. The State counters that the evidence not only placed Southern at the crime scene, but placed him there when the only two people present were the assailant and the victim.

¶92. Circumstantial evidence alone is sufficient to obtain a conviction. *Johnson*, ¶ 43 (citing *State v. Lancione*, 1998 MT 84, ¶ 37, 956 P.2d 1358, ¶ 37, 55 St.Rep. 344, ¶ 37). "Circumstantial evidence must only be of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt, and all facts and circumstances must be considered collectively." *Johnson*, ¶ 43 (quoting *Lancione*, ¶ 37 and *State v. Weaver* (1981), 195 Mont. 481, 495, 637 P.2d 23, 31).

¶93. The evidence against Southern included Hewitt's testimony regarding a pair of sunglass which the victim knocked off her assailant's face during the attack and which were subsequently found on the floor of the victim's bedroom. Hewitt found a footprint left on the lens of the sunglasses which she compared to the sole of a pair of Southern's shoes. Hewitt determined that the footprint was made by the left sole of Southern's shoe to the exclusion of all other shoes. In addition, Ammen testified that pubic hairs found on the bed where the rape occurred were consistent with Southern's pubic hair sample but inconsistent with the victim's pubic hair sample.

¶94. Notwithstanding, Southern asserts that this evidence only establishes that he was at the crime scene. As we stated above, presence at a crime scene is insufficient, by itself, to prove criminal liability. *Johnston*, 267 Mont. at 481, 885 P.2d at 406 (citation omitted). However, as the State correctly points out, this evidence not only placed Southern at the scene but also placed him at the crime scene when the only people there were the victim and her attacker. Consequently, we conclude that even though the evidence on Counts VI, VII and VII was circumstantial, it was of sufficient quality and quantity that a reasonable jury could find Southern guilty of the offenses charged beyond a reasonable doubt. Therefore, having reviewed the record, we hold that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Southern committed the offenses of burglary, sexual intercourse without consent, and theft as charged in Counts VI, VII and VIII.

## Conclusion

¶95. In summary, we hold that the District Court did not err in denying Southern's motion to sever the counts against him into four separate trials, did not err in admitting microscopic hair comparison evidence at trial, did not err in admitting DNA evidence from the rape kit which had been opened so that the nurse could double check her paperwork, and that there was sufficient evidence for the jury to

**convict Southern on Counts II through VIII. Therefore, we affirm Southern's convictions.**

**¶96. Affirmed.**

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

1. [1] In *Matt*, we also clarified the procedural protections which *Just* required. *Matt*, 249 Mont. at 142-43, 814 P.2d at 56. These procedural protections, however, are not at issue in the instant case.

2. [2] See *State v. Bromgard* (1993), 261 Mont. 291, 293-94, 862 P.2d 1140, 1141; *State v. Kordonowy* (1991), 251 Mont. 44, 47, 823 P.2d 854, 856; *State v. Coleman* (1981), 194 Mont. 428, 447, 633 P.2d 624, 636; *State v. Higley* (1980), 190 Mont. 412, 428, 621 P.2d 1043, 1053; and *Coleman v. State* (1978), 177 Mont. 1, 26-27, 579 P.2d 732, 747. See also Gregory G. Sarno, Annotation, *Admissibility and Weight, in Criminal Case, of Expert or Scientific Evidence Respecting Characteristics and Identification of Human Hair*, 23 A.L.R.4th 1199 (1983).